## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, a corporation,<br><br>Plaintiff,<br><br>v.<br><br>JUNIORETTE GRIFFIN SMITH, as administratrix of the estate of ROGER DALE SMITH, DECEASED,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  CASE NO.: 2:07-cv-216-MEF<br>)<br>)<br>)<br>)<br>)<br>) |

## MOTION FOR SUMMARY JUDGMENT ON BEHALF OF PLAINTIFF ZURICH AMERICAN INSURANCE COMPANY

COMES NOW the plaintiff, Zurich American Insurance Company ("Zurich"), and, pursuant to Federal Rule of Civil Procedure 56, hereby moves the Court to enter summary judgment in favor of Zurich and against the Defendant as to all claims and counterclaims in the above-captioned action on the grounds that there is no dispute as to any material fact and Zurich is entitled to judgment as a matter of law. This Motion is based upon the pleadings, the parties' Joint Stipulation of Facts previously filed with the Court (attached hereto as Exhibit 1), the depositions of the Defendant (transcript attached hereto as Exhibit 2), Doug Boutwell (transcript attached hereto as Exhibit 3), and David Scott (transcript attached hereto as Exhibit 4), and the brief submitted contemporaneously herewith. In further support of its Motion, Zurich says as follows:

1.    This declaratory judgment action arises out of the claim made by the Defendant on behalf of the estate of Roger Dale Smith ("Smith") for uninsured/underinsured

motorist ("UM") benefits under a policy of business automobile insurance (the "Zurich policy") issued by Zurich to Boan Contracting Company, Inc. ("Boan").

2.     Smith died as the result of a traffic accident on September 8, 2005. At the time of his fatal accident, Smith was operating his own privately owned vehicle. As such, he was not an "insured" under the Liability Coverage section of the auto policy at issue, because he was neither a named insured nor did he fall within the definition of an insured for purposes of the Liability Coverage section.

3.     Moreover, at the time of his accident, Smith was not an insured under the Alabama Uninsured Motorist Coverage Endorsement of the Zurich policy because he was not occupying a "covered 'auto'" or "a temporary substitute for a covered 'auto'" as defined by that endorsement. "Covered auto" for purposes of the UM coverage provided by the Zurich policy included only automobiles owned by Boan or another named insured. Smith owned the car in question and was not a named insured, so the policy did not provide the UM coverage claimed by the Defendant.

4.     As a matter of law, therefore, Zurich is entitled to a declaration that the policy in question did not cover Smith with respect to his September 8, 2005, accident, and the Defendant's breach of contract claim is due to be dismissed.

5.     Zurich has not acted in bad faith, and the Defendant's counterclaim for bad faith failure to pay her claim under the policy is due to be dismissed. Zurich properly denied Defendant's claim on the grounds that Smith was not an insured under the Zurich policy. Zurich did not breach its contract with Boan, and Defendant's bad faith claim consequently fails as a matter of law.

2

WHEREFORE, premises considered, Zurich requests the Court to enter an Order granting summary judgment in favor of Zurich, and against the Defendant, as to all claims asserted by Zurich and all counterclaims asserted by the Defendant in this action.

/s/ Vernon L. Wells, II
Vernon L. Wells, II (asb-2950-l35v)

/s/ J. David Moore
J. David Moore (asb-8552-r70j)

Attorneys for Plaintiff
Zurich American Insurance Company

OF COUNSEL:

Walston, Wells & Birchall, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone: (205) 244-5200
Telecopier: (205) 244-5400
.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

**Christopher M. Sledge**
**Woodard, Patel & Sledge**
**1213 East Three Notch Street**
**Andalusia, Alabama 36420**

This the 10th day of March, 2008.

/s/ J. David Moore
OF COUNSEL

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, a corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION No. CV-07-216 |
| JUNIORETTE GRIFFIN SMITH, as administratrix of the estate of ROGER DALE SMITH, DECEASED, | ) ) ) ) | |
| Defendant. | ) ) | |

## JOINT STIPULATION OF FACTS

COME NOW the parties, Plaintiff Zurich American Insurance Company ("Zurich") and Defendant Juniorette Griffin Smith ("Defendant"), and jointly stipulate to the following facts relevant to the disposition of this action:

1.      Zurich is a corporation organized and existing under the laws of the state of New York, with its principal place of business in Schaumburg, Illinois.

2.      Defendant is a resident of Andalusia, Alabama.

3.      Defendant has been appointed by the Probate Court of Covington County, Alabama, as the administratrix of the estate of Roger Dale Smith ("Smith"), deceased.

4.      Smith was also a resident of Andalusia, Alabama, prior to his death.

5.      Defendant, through her attorney, has asserted a claim against Zurich for $3,000,000.00, which Defendant contends is available in uninsured motorist coverage under a policy issued by Zurich.

6.      On or about June 1, 2005, Zurich issued to Boan Contracting Company, Inc., its commercial business automobile policy number BAP 4896511-02 ("the Boan

1

Policy"). A true and correct copy of this policy is attached hereto as Exhibit A and is incorporated by reference herein.

7.     The Boan Policy was effective from June 1, 2005, until June 1, 2006.

8.     On September 8, 2005, on Alabama Highway 87, near its intersection with Geneva County Road 16, south of Sampson, Alabama, a vehicle owned and operated by Roger Smith collided with a vehicle operated by Sylvia Hornsby Carter of Sampson, Alabama, and owned by Derrick Carter of Sampson, Alabama.

9.     Smith died of injuries sustained in this automobile accident.

10.     At the time of the collision described above, Smith was an employee of Boan Contracting Company, Inc.

11.     Smith was operating the automobile in which he was injured in the collision described above.

12.     Smith was the owner of the automobile in which he was injured in the collision described above.

13.     On May 3, 2006, Zurich was notified by letter from Defendant's attorney that Defendant, as administratrix of the estate of Roger Smith, intended to make a claim for underinsured and/or uninsured motorist coverage benefits under any and all fleet policies issued by Zurich to Boan Contracting Company, Inc.

14.     On June 14, 2006, Defendant's attorney, by letter on behalf of Defendant, as administratrix of the estate of Roger Smith, made a demand on Zurich to settle the claim of the estate of Roger Smith under the Boan Policy for "policy limits in the amount of $1,000,000.00."

15.     On July 10, 2006, Zurich, through its attorney, denied Defendant's claim of uninsured motorist benefits under the Boan Policy.

16.     On November 21, 2006, Defendant, by a letter from her attorney, demanded from Zurich $3,000,000.00 in settlement of her claim under the uninsured motorist provisions of the Boan Policy.


/s/ Vernon L. Wells. II_____
Vernon L. Wells, II
J. David Moore

Attorneys for Plaintiff Zurich American Insurance Company

OF COUNSEL
Walston, Wells & Birchall, LLP
1819 5th Avenue North, Suite 1100
Birmingham, Alabama 35203
Telephone: (205) 244-5200
Telecopier: (205) 244-5400



/s/ Christopher M. Sledge_____
Christopher M. Sledge

Attorney for Defendant Juniorette Griffin Smith, as Administratrix of the Estate of Roger Dale Smith, deceased

OF COUNSEL
Woodard, Patel & Sledge
1213 East Three Notch Street
Andalusia, Alabama 36420

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing JOINT STIPULATION OF FACTS has been electronically filed with the Clerk of Court using the ECF system which will send notification of such filing to the following:

> Christopher M. Sledge
> WOODARD, PATEL & SLEDGE
> 1213 East Three Notch Street
> Andalusia, Alabama 36420

This the 20th day of July, 2007.

> /s/ Vernon L. Wells, II
> Of Counsel

4

**COMMERCIAL INSURANCE**

**COMMON POLICY DECLARATIONS**

Policy Number BAP 4896511-02                                     Renewal of Number BAP 4896511-01

Named Insured and Mailing Address

BOAN CONTRACTING CO., INC.
(SEE ENDORSEMENT U-GU-621-ACW)
P.O. BOX 778
GREENVILLE AL 36037

Producer and Mailing Address

TURNER INSURANCE & BONDING COM
PO BOX 230789
MONTGOMERY AL 361230789

Producer Code 09798-000

Policy Period:  Coverage begins   06-01-05   at 12:01 A.M.;   Coverage ends   06-01-06   at 12:01 A.M.

The named insured is   ☐ Individual      ☐ Partnership      ☒ Corporation
                       ☐ Other:

This insurance is provided by one or more of the stock insurance companies which are members of the Zurich-American Insurance Group. The company that provides coverage is designated on each Coverage Part Common Declarations. The company or companies providing this insurance may be referred to in this policy as "The Company", we, us, or our. The address of the companies of the Zurich-American Insurance Group are provided on the next page.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE(S):

BUSINESS AUTOMOBILE                                    PREMIUM  $    88,695.00
  issued by ZURICH AMERICAN INSURANCE COMPANY

| | |
|---|---|
| **THIS PREMIUM MAY BE SUBJECT TO AUDIT.** This premium does not include Taxes and Surcharges. | **TOTAL**     $         88,695.00 SEE INSTALLMENT SCHEDULE |
| **Taxes and Surcharges** | **TOTAL**     $ |
| The Form(s) and Endorsement(s) made a part of this policy at the time of issue are listed on the **SCHEDULE of FORMS and ENDORSEMENTS.** | |
| Countersigned this        day of                                    _Authorized Representative_ | |

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART FORM(S), FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

EXHIBIT A

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY.
THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE
TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE OF PREMIUM
# (RELATING TO DISPOSITION OF TRIA)

### SCHEDULE*

---

**(1)** Premium attributable to risk of loss from certified acts of terrorism through the end of the policy period based on the extension of the Terrorism Risk Insurance Act of 2002 ("TRIA"):

```
1% OF YOUR AUTO PREMIUM
```

If TRIA terminates, the portion of this premium attributable to the remaining part of the policy period, as modified by any change shown in (2) of this Schedule, applies to the risk of loss from terrorism after the termination of TRIA.

**(2)** Premium change upon termination of TRIA or upon applicability of a Conditional Endorsement:

   No change unless one of the following is completed -

   Return Premium:

   Additional Premium:

If we notify you of an additional premium charge, the additional premium will be due as specified in such notice.

---

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act of 2002 ("TRIA"), we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the risk of loss from terrorist acts certified under that Act. That portion of your premium attributable is shown in the Schedule of this endorsement or in the Declarations.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. The Act currently provides for no insurance industry or United States government participation in terrorism losses that exceed $100 billion in any one calendar year. The federal program established by the Act is scheduled to

terminate at the end of 12/31/05 unless extended by the federal government.

**C. Possibility of Additional or Return Premium**

The premium attributable to the risk of loss from certified acts of terrorism coverage is calculated based on the coverage (if any) in effect at the beginning of your policy for certified acts of terrorism. If your policy contains a Conditional Endorsement, the termination of TRIA or extension of the federal program with certain modifications (as explained in that endorsement) may modify the extent of coverage (if any) your policy provides for terrorism. If TRIA terminates or the Conditional Endorsement becomes applicable to your policy, the return premium (if any) or additional premium (if any) shown in (2) of the Schedule will apply. If the level or terms of federal participation change, the premium shown in (1) of the Schedule attributable to that part of the policy period extending beyond such a change may not be appropriate and we will notify you of any changes in your premium.

Includes copyrighted material of ISO Properties, Inc. with its permission.
Copyright Zurich American Insurance Company 2004

U-GU-692-A CW (08/04)
Page 1 of 1

## Important Notice - In Witness Clause

In return for the payment of premium and subject to all the terms of the policy, we agree with you to provide insurance as stated in this policy.  This policy shall not be valid unless countersigned by the duly authorized Representative of the Company.

**In Witness Whereof,** this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly authorized Representative.

**President**                                          **Corporate Secretary**

Zurich American Insurance Company
American Guarantee and Liability Insurance Company
American Zurich Insurance Company
Zurich American Insurance Company of Illinois
     Administrative Offices
     Zurich Towers
     1400 American Lane
     Schaumburg, Illinois 60196-1056

---

**QUESTIONS ABOUT YOUR INSURANCE?**  Your agent or broker is best equipped to provide information about your insurance.  Should you require additional information or assistance in re-solving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich North America
Customer Inquiry Center
1400 American Lane
Schaumburg, Illinois 60196-1056
**1-800-382-2150 (Business Hours:  8 a.m. - 4 p.m. [CT])**

---

U-GU-319-E (5/96)
Page 1 of 1

## INSTALLMENT PREMIUM SCHEDULE

The total premium shown in the Declarations of this policy is made payable in installments, on the dates and in the amounts shown below.

| Premium | Service Charge | Total Due | Date Due |
|---|---|---|---|
| $22,176.00 | | $22,176.00 | 06/01/05 |
| $7,391.00 | | $7,391.00 | 07/01/05 |
| $7,391.00 | | $7,391.00 | 08/01/05 |
| $7,391.00 | | $7,391.00 | 09/01/05 |
| $7,391.00 | | $7,391.00 | 10/01/05 |
| $7,391.00 | | $7,391.00 | 11/01/05 |
| $7,391.00 | | $7,391.00 | 12/01/05 |
| $7,391.00 | | $7,391.00 | 01/01/06 |
| $7,391.00 | | $7,391.00 | 02/01/06 |
| $7,391.00 | | $7,391.00 | 03/01/06 |

Failure to pay the Installment Premium by the Date Due shown shall constitute non-payment of premium for which we may cancel this policy.

U-GU-315-A (01/93)

**Policy Number**
**BAP 4896511-02**

SCHEDULE OF FORMS AND ENDORSEMENTS

## ZURICH AMERICAN INSURANCE COMPANY

| Named Insured | BOAN CONTRACTING CO., INC. | Effective Date: | 06-01-05 |
|---|---|---|---|
| | | 12:01 A.M., Standard Time | |
| Agent Name | TURNER INSURANCE & BONDING COM | Agent No. | 09798-000 |

COMMON POLICY FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| U-GU-692-A CW | 08-04 | DISCLOSURE OF PREMIUM (RELATING TO TRIA) |
| U-GU-D-310-A | 01-93 | COMMON POLICY DECLARATIONS |
| U-GU-319-E | 05-96 | IN WITNESS CLAUSE |
| U-GU-315-A | 01-93 | SCHEDULE OF INSTALLMENTS |
| U-GU-619-A CW | 10-02 | SCHEDULE OF FORMS AND ENDORSEMENTS |
| UGU621ACW | 10-02 | SCHEDULE OF NAMED INSURED(S) |
| IL 00 17 | 11-98 | COMMON POLICY CONDITIONS |
| IL 00 21 | 07-02 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDT |
| IL 00 03 | 07-02 | CALCULATION OF PREMIUM |
| U-GU-596-ACW | 05-02 | EARLIER NOTICE OF NON-RENEWAL OR CHANGE |

AUTOMOBILE FORMS AND ENDORSEMENTS

| | | |
|---|---|---|
| CA 99 10 | 09-02 | DRIVE OTHER CAR COV-BROAD COV NAMED IND |
| U-CA-D-370-A | 10-01 | BUSINESS AUTO COVERAGE FORM DECLARATION |
| U-CA-D-370-1-A | 07-94 | BUSINESS AUTO DECLARATIONS (CONT'D) |
| U-CA-411-A CW | 10-96 | PREM & REPORTS AGREEMENT COMP RATED POL |
| CA 00 01 | 10-01 | BUSINESS AUTO COVERAGE FORM |
| CA 99 03 | 07-97 | AUTO MEDICAL PAYMENTS COVERAGE |
| CA 03 01 | 12-93 | DEDUCTIBLE LIABILITY COVERAGE |
| CA 21 59 | 12-02 | ALABAMA UM INSURANCE |
| CA 00 38 | 12-02 | WAR EXCLUSION |
| CA 20 01 | 10-01 | ADDL INSD-LESSOR |
| CA 99 44 | 12-93 | LOSS PAYABLE CLAUSE |
| CA 99 54 | 07-97 | COVERED AUTO DESIGNATION SYMBOL |
| UCA388A-1 | 07-94 | PHYSICAL DAMAGE DEDUCTIBLE ENDORSEMENT |

U-GU-619-A CW (10/02)

**Policy Number**
**BAP 4896511-02**

SCHEDULE OF NAMED INSURED(S)

# ZURICH AMERICAN INSURANCE COMPANY

| | | |
|---|---|---|
| Named Insured | BOAN CONTRACTING CO., INC. | Effective Date:  06-01-05 |
| | | 12:01 A.M., Standard Time |
| Agent Name | TURNER INSURANCE & BONDING COM | Agent No.  09798-000 |

NAMED INSURED

BOAN CONTRACTING CO., INC.

BOAN ENTERPRISES, INC.

PINE ENERGIES, INC.

LIGHTWAVE TECHNOLOGIES, LLC

CHEVAL HOLDINGS, LLC

BOAN DEVELOPMENT CORPORATION

U-GU-621-A CW (10/02)

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

    a. Make inspections and surveys at any time;

    b. Give you reports on the conditions we find; and

    c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    a. Are safe or healthful; or

    b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

IL 00 21 07 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

© ISO Properties, Inc., 2001

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

    © ISO Properties, Inc., 2001    IL 00 21 07 02    □

IL 00 03 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

    BOILER AND MACHINERY COVERAGE PART
    CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART
    CRIME AND FIDELITY COVERAGE PART
    EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
    FARM COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    PROFESSIONAL LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

## EARLIER NOTICE OF NON-RENEWAL OR CHANGE IN COVERAGE

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'l. Prem | Return Prem. |
|---|---|---|---|---|---|---|
| | | | | | $ | $ |

This endorsement modifies the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
BUSINESS AUTOMOBILE COVERAGE FORM

### SCHEDULE

**Name**                    **Address**                    **Project Name/Number/Description**

**Number or Day's Notice**    60

(If no entry appears above, information required to complete this Schedule will be shown in the Declarations as applicable to this endorsement.)

A.  For any statutorily permitted reason other than nonpayment of premium, the number of days required for notice of non-renewal, as provided in the Policy Conditions, as amended by an applicable state endorsement, or as provided by an applicable state's change in coverage regulation is increased to the number of days shown in the Schedule above.

B.  We will not provide notice of non-renewal and/or change in coverage to the first Named Insured or any person or organization shown in the Schedule, if:

1.  You have purchased insurance elsewhere;

2.  You have obtained replacement coverage or have agreed in writing to obtain replacement coverage;

3.  You have requested or agreed to non-renewal; or,

4.  We, or another company within the same insurance group have offered to issue a renewal.

U-GU-596-A CW (05/02)
Page 1 of 1

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

POLICY NUMBER: BAP 4896511-02

COMMERCIAL AUTO
CA 99 10 09 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DRIVE OTHER CAR COVERAGE - BROADENED COVERAGE FOR NAMED INDIVIDUALS

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Effective: | Countersigned By: |
|---|---|
| Named Insured: | (Authorized Representative) |

## SCHEDULE

| Name Of Individual | Liability | | Auto Medical Payments | |
|---|---|---|---|---|
| | Limit | Premium | Limit | Premium |
| W.E. BOAN | $ 1,000,000 | $ 582 | $ 5,000 | $ 26 |
| LAURICE BOAN | $ 1,000,000 | INCLUDED | | INCLUDED |
| BARRY & AMY BOAN | $ 1,000,000 | INCLUDED | | INCLUDED |
| ALAN & CHRISTIN BOAN | $ 1,000,000 | INCLUDED | | INCLUDED |
| DEAN BOAN | $ 1,000,000 | INCLUDED | | INCLUDED |

| Name Of Individual | Uninsured Motorists | | Underinsured Motorists | | Physical Damage | |
|---|---|---|---|---|---|---|
| | | | | | Comp. | Coll. |
| | Limit | Premium | Limit | Premium | | |
| W.E. BOAN | SEE SCHED | $ 77 | | | $ 115 | $ 271 |
| LAURICE BOAN | | INCLUDED | | | INCLUDED | INCLUDED |
| BARRY & AMY BOAN | | INCLUDED | | | INCLUDED | INCLUDED |
| ALAN & CHRISTIN BOAN | | INCLUDED | | | INCLUDED | INCLUDED |
| DEAN BOAN | | INCLUDED | | | INCLUDED | INCLUDED |

Note - When uninsured motorists is provided at limits higher than the basic limits required by a financial responsibility law, underinsured motorists is included, unless otherwise noted. If Underinsured Motorists Coverage is provided as a separate coverage, make appropriate entry in the Schedule above.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** This endorsement changes only those coverages where a premium is shown in the Schedule.

**B. Changes In Liability Coverage**

1. Any "auto" you don't own, hire or borrow is a covered "auto" for Liability Coverage while being used by any individual named in the Schedule or by his or her spouse while a resident of the same household except:

   a. Any "auto" owned by that individual or by any member of his or her household.

   b. Any "auto" used by that individual or his or her spouse while working in a business of selling, servicing, repairing or parking "autos".

2. The following is added to **Who Is An Insured:**

   Any individual named in the Schedule and his or her spouse, while a resident of the same household, are "insureds" while using any covered "auto" described in Paragraph B.1. of this endorsement.

**C. Changes In Auto Medical Payments And Uninsured And Underinsured Motorists Coverages**

The following is added to **Who Is An Insured:**

Any individual named in the Schedule and his or her "family members" are "insured" while "occupying" or while a pedestrian when being struck by any "auto" you don't own except:

Any "auto" owned by that individual or by any "family member".

**D. Changes In Physical Damage Coverage**

Any private passenger type "auto" you don't own, hire or borrow is a covered "auto" while in the care, custody or control of any individual named in the Schedule or his or her spouse while a resident of the same household except:

1. Any "auto" owned by that individual or by any member of his or her household.

2. Any "auto" used by that individual or his or her spouse while working in a business of selling, servicing, repairing or parking "autos".

**E. Additional Definition**

As used in this endorsement:

"Family member" means a person related to the individual named in the Schedule by blood, marriage or adoption who is a resident of the individual's household, including a ward or foster child.

    © ISO Properties, Inc., 2002    CA 99 10 09 02    □

POLICY NUMBER: BAP 4896511-02

COMMERCIAL AUTO
CA 99 10 09 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DRIVE OTHER CAR COVERAGE - BROADENED COVERAGE FOR NAMED INDIVIDUALS

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Effective: | Countersigned By: |
|---|---|
| Named Insured: | (Authorized Representative) |

**SCHEDULE**

| Name Of Individual | Liability | | Auto Medical Payments | |
|---|---|---|---|---|
| | Limit | Premium | Limit | Premium |
| DAVID SCOTT | $  1,000,000<br>$  1,000,000 | INCLUDED | | INCLUDED |

| Name Of Individual | Uninsured Motorists | | Underinsured Motorists | | Physical Damage | |
|---|---|---|---|---|---|---|
| | | | | | Comp. | Coll. |
| | Limit | Premium | Limit | Premium | | |
| DAVID SCOTT | SEE SCHED | INCLUDED | | | INCLUDED | INCLUDED |

Note - When uninsured motorists is provided at limits higher than the basic limits required by a financial responsibility law, underinsured motorists is included, unless otherwise noted. If Underinsured Motorists Coverage is provided as a separate coverage, make appropriate entry in the Schedule above.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

CA 99 10 09 02 © ISO Properties, Inc., 2002 Page 1 of 2

**A. This endorsement changes only those coverages where a premium is shown in the Schedule.**

**B. Changes In Liability Coverage**

1. Any "auto" you don't own, hire or borrow is a covered "auto" for Liability Coverage while being used by any individual named in the Schedule or by his or her spouse while a resident of the same household except:

   a. Any "auto" owned by that individual or by any member of his or her household.

   b. Any "auto" used by that individual or his or her spouse while working in a business of selling, servicing, repairing or parking "autos".

2. The following is added to **Who Is An Insured:**

   Any individual named in the Schedule and his or her spouse, while a resident of the same household, are "insureds" while using any covered "auto" described in Paragraph **B.1.** of this endorsement.

**C. Changes In Auto Medical Payments And Uninsured And Underinsured Motorists Coverages**

The following is added to **Who Is An Insured:**

Any individual named in the Schedule and his or her "family members" are "insured" while "occupying" or while a pedestrian when being struck by any "auto" you don't own except:

Any "auto" owned by that individual or by any "family member".

**D. Changes In Physical Damage Coverage**

Any private passenger type "auto" you don't own, hire or borrow is a covered "auto" while in the care, custody or control of any individual named in the Schedule or his or her spouse while a resident of the same household except:

1. Any "auto" owned by that individual or by any member of his or her household.

2. Any "auto" used by that individual or his or her spouse while working in a business of selling, servicing, repairing or parking "autos".

**E. Additional Definition**

As used in this endorsement:

"Family member" means a person related to the individual named in the Schedule by blood, marriage or adoption who is a resident of the individual's household, including a ward or foster child.

     © ISO Properties, Inc., 2002     CA 99 10 09 02    □

# COMMERCIAL
# AUTO INSURANCE

## BUSINESS AUTO COVERAGE PART DECLARATIONS

Insurance for this coverage part provided by:
**ZURICH AMERICAN INSURANCE COMPANY**

Policy Number BAP 4896511-02
Renewal of Number BAP 4896511-01

### ITEM ONE

| Named Insured and Mailing Address | Producer and Mailing Address |
|---|---|
| | |

**SEE COMMON POLICY DECLARATIONS**

**Policy Period: From 06-01-05 to 06-01-06 at 12:01 A.M. Standard Time at your mailing address shown above.**

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

### ITEM TWO - SCHEDULE OF COVERAGES AND COVERED AUTOS

This policy provides only those coverages where a charge is shown in the premium column below. Each of these coverages will apply only to those "autos" shown as covered "autos." "Autos" are shown as covered "autos" for a particular coverage by the entry of one or more of the symbols from the COVERED AUTOS Section of the Business Auto Coverage Form next to the name of the coverage.

| COVERAGES | COVERED AUTOS (Entry of one or more of the symbols from the COVERED AUTOS Section of the Business Auto Coverage Form shows which autos are covered autos) | LIMIT THE MOST WE WILL PAY FOR ANY ONE ACCIDENT OR LOSS | PREMIUM |
|---|---|---|---|
| LIABILITY | 1 | $  1,000,000 | $   72,010.00 |
| PERSONAL INJURY (P.I.P.) †† | | SEPARATELY STATED IN EACH P.I.P. END. MINUS $              Deductible | $ |
| ADDED P.I.P. (or equivalent added No-fault cov.) | | SEPARATELY STATED IN EACH ADDED P.I.P. ENDORSEMENT | $ |
| PROPERTY PROTECTION INS (P.P.I.) (Michigan only) | | SEPARATELY STATED IN THE P.P.I. ENDORSEMENT MINUS $              Deductible FOR EACH ACCIDENT | $ |
| AUTO MEDICAL PAYMENTS | 7 | $      5,000 | $        INCL. |
| UNINSURED MOTORISTS (UM) | 2 | $  1,000,000 | $        INCL. |
| UNDERINSURED MOTORISTS (when not included in UM Cov.) | 2 | $  1,000,000 | $        INCL. |
| PHYSICAL DAMAGE COVERAGE  COMPREHENSIVE COVERAGE | 8,10 | ACTUAL CASH VALUE OR COST OF REPAIR, WHICHEVER IS LESS MINUS | $ SEE SCHEDULE Ded. FOR EACH COVERED AUTO. BUT NO DED. APPLIES TO LOSS CAUSED BY FIRE OR LIGHTNING.  ††† | $    3,320.00 |
| PHYSICAL DAMAGE COVERAGE  SPECIFIED CAUSES OF LOSS COVERAGE | | | $         Ded. FOR EACH COVERED AUTO FOR LOSS CAUSED BY MISCHIEF OR VANDALISM  ††† | $ |
| PHYSICAL DAMAGE COVERAGE  COLLISION COVERAGE | 8,10 | | $ SEE SCHEDULE Deductible FOR EACH COVERED AUTO  ††† | $   12,633.00 |
| PHYSICAL DAMAGE COVERAGE  TOWING AND LABOR (Not Available in California) | | | $ auto        for each disablement of a private passenger | |

| FORMS AND ENDORSEMENTS APPLYING TO THIS COVERAGE PART AND MADE A PART OF THIS POLICY AT TIME OF ISSUE: | PREMIUM FOR ENDORSEMENTS | $      732.00 |
|---|---|---|
| **SEE SCHEDULE OF FORMS AND ENDORSEMENTS** | ESTIMATED TOTAL PREMIUM | $   88,695.00 |

### ITEM THREE - SCHEDULE OF COVERED AUTOS YOU OWN:     SEE SCHEDULE OF COVERED AUTOS YOU OWN

†† (or equivalent No-fault cov.)  ††† See ITEM FOUR for hired or borrowed "autos".

Countersigned:
Date: _____  By: _____
                                          Authorized Representative

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PARTS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

U-CA-D-370-A (10/01)

**Part 2**

POLICY NUMBER: BAP 4896511-02        BUSINESS AUTO DECLARATIONS (Continued)

**ITEM FOUR - SCHEDULE OF HIRED OR BORROWED COVERED AUTO COVERAGE AND PREMIUMS. LIABILITY COVERAGE - RATING BASIS, COST OF HIRE**

| STATE | ESTIMATED COST OF HIRE FOR EACH STATE | RATE PER EACH $100 COST OF HIRE | FACTOR (IF LIAB. COV. IS PRIMARY) | PREMIUM |
|---|---|---|---|---|
| AL | IF ANY | $ 1.919 | | $        INCL |
| | | | | $ |
| | | | | $ |
| | | | TOTAL PREMIUM | $        INCL |

Cost of hire means the total amount you incur for the hire of "autos" you don't own (not including "autos" you borrow or rent from your partners or employees or their family member(s). Cost of hire does not include charges for services performed by motor carriers of property or passengers.

**PHYSICAL DAMAGE COVERAGE**

| COVERAGES | | LIMIT OF INSURANCE<br>THE MOST WE WILL PAY, DEDUCTIBLE | ESTIMATED ANNUAL COST OF HIRE | RATE | PREMIUM |
|---|---|---|---|---|---|
| COMPREHENSIVE | ACTUAL CASH VALUE, COST OF REPAIRS OR | $ 50,000   WHICHEVER IS LESS, MINUS $ 1,000<br>DEDUCTIBLE FOR EACH COVERED AUTO, BUT NO DEDUCTIBLE<br>APPLIES TO LOSS CAUSED BY FIRE OR LIGHTNING | 50,000 | | $        INCL |
| SPECIFIED CAUSES OF LOSS | | $   WHICHEVER IS LESS, MINUS $25 DEDUCTIBLE<br>FOR EACH COVERED AUTO FOR LOSS CAUSED BY MISCHIEF OR VANDALISM | | | $ |
| COLLISION | | $ 50,000   WHICHEVER IS LESS, MINUS $ 1,000<br>DEDUCTIBLE FOR EACH COVERED AUTO | 50,000 | | $        INCL |
| | | | TOTAL PREMIUM $ | | INCL |

PHYSICAL DAMAGE COVERAGE for covered "autos" you hire or borrow is excess unless indicated below by "☒".

☒   If this box is checked, PHYSICAL DAMAGE COVERAGE applies on a direct primary basis and for purposes of the condition entitled OTHER INSURANCE, any covered "auto" you hire or borrow is deemed to be a covered "auto" you own.

**ITEM FIVE - SCHEDULE FOR NON-OWNERSHIP LIABILITY**

| NAMED INSURED'S BUSINESS | RATING BASIS | NUMBER | PREMIUM |
|---|---|---|---|
| Other than a Social Service Agency | Number of Employees | 75 | $        INCL |
| | Number of Partners | | $ |
| Social Service Agency | Number of Employees | | $ |
| | Number of Volunteers | | $ |
| | | | $        INCL |

**ITEM SIX - SCHEDULE FOR GROSS RECEIPTS OR MILEAGE BASIS - LIABILITY COVERAGE - PUBLIC AUTO OR LEASING RENTAL CONCERNS**

| Estimated Yearly | RATES | | PREMIUMS | |
|---|---|---|---|---|
| ☐ Gross Receipts<br>☐ Mileage | ☐ Per $100 of Gross Receipts<br>☐ Per Mile | | | |
| | LIABILITY COVERAGE | AUTO MEDICAL PAYMENTS | LIABILITY COVERAGE | AUTO MEDICAL PAYMENTS |
| | | | $ | $ |
| | | | $ | $ |
| | | | $ | $ |
| | | | $ | $ |
| | | TOTAL PREMIUMS $ | $ | |
| | | MINIMUM PREMIUMS $ | $ | |

When used as a premium basis:

**FOR PUBLIC AUTOS**

    **Gross Receipts** means the total amount to which you are entitled for transporting passengers, mail or merchandise during the policy period regardless of whether you or any other carrier originate the transportation. Gross Receipts does not include:

        A. Amounts you pay to railroads, steamship lines, airlines and other motor carriers operating under their own ICC or PUC permits.

        B. Advertising Revenue.

        C. Taxes which you collect as a separate item and remit directly to a governmental division.

        D. C.O.D. collections for cost of mail or merchandise including collection fees.

    **Mileage** means the total live and dead mileage of all revenue producing units operated during the policy period.

**FOR RENTAL OR LEASING CONCERNS**

    **Gross Receipts** means the total amount to which you are entitled for the leasing or rental of "autos" during the policy period and includes taxes except those taxes which you collect as a separate item and remit directly to a governmental division.

    **Mileage** means the total of all live and dead mileage developed by all the "autos" you leased or rented to others during the policy period.

U-CA-D-370-1-A (07-94)

**PREMIUM AND REPORTS AGREEMENT - COMPOSITE RATED POLICIES**

**This endorsement changes the policy. Please read it carefully.**

This endorsement modifies insurance provided under the:

BUSINESS AUTO COVERAGE FORM

## SCHEDULE

1. **Unit Of Exposure (Check One):**

   ☒ per licensed "auto"          ☐ per $1,000 gross sales          ☐ per 10,000 miles

   ☐ per $1,000 payroll          ☐ per 1,000 gallons          ☐ per other, as described below:

| 2. Coverage Unit of Exposure | Rate(s) | Estimated Premium(s) |
|---|---|---|
| LIAB (67 POWER UNITS) | $1,093 | $73,231 |
| PHYS DMG (58 POWER UNITS) | $  254 | $14,732 |
| LIAB/PHYS DMG (TRAILERS) | INCLUDED | INCLUDED |
|  |  |  |
|  |  |  |

3. **Deposit Premium:**   INCL

4. **Minimum Premium:** $69,044

Condition 6, Premium Audit, of Part B, General Conditions, of Section IV, Business Auto Conditions, is replaced by the following:

6. **Premium Audit**

   a. We will compute all premiums for this Coverage Part according to our rules and the composite rates shown in the Schedule above or attached hereto.

   b. For policies other than Annual Reporting, the deposit premium shown in the Schedule is due and payable on the first day of the policy period. The first Named Insured will pay, within 20 days following the mailing or delivery of the statement of audited premium for each audit period, the earned premium due.

   c. Within 180 days after this Coverage Part expires we will conduct an audit, which may not be waived. We will compute the earned premium for the policy period by multiplying the composite rate against the total developed exposure. If the earned premium is greater than the sum of the deposit premiums, the first Named Insured will pay us the excess; if less, we will return the unearned portion to the first Named Insured. However, the earned premium will not be less than the greater of 80% of the estimated annual premium, or the Minimum Premium shown in the Schedule.

   d. The first Named Insured must maintain records

of the information we need for premium computation and send us copies at such times as we may request.

   e. The units of exposure shown in the Schedule are defined as follows:

   1) Gallons means the total number of gallons of liquid petroleum gases invoiced on any basis to any customer, whether or not the insured actually takes possession of such gases.

   2) Gross sales means gross sales invoiced, before discounts, but does not include taxes collected for any governmental unit.

   3) Licensed "auto" means the final average of the number of "autos" at policy inception and the number of "autos" at policy termination.

   4) Miles means the total mileage driven during the policy period by all licensed "autos" owned by you.

   5) Other means the unit of exposure defined in the Unit of Exposure endorsement attached to this policy.

   6) Payroll means total remuneration for all employees of the insured as defined in our rating manuals.

U-CA-411-A CW (10/96)
Page 1 of 1

COMMERCIAL AUTO
CA 00 01 10 01

# BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERED AUTOS

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos". The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

**A. Description Of Covered Auto Designation Symbols**

| Symbol | | Description Of Covered Auto Designation Symbols |
|---|---|---|
| 1 | Any "Auto" | |
| 2 | Owned "Autos" Only | Only those "autos" you own (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" you acquire ownership of after the policy begins. |
| 3 | Owned Private Passenger "Autos" Only | Only the private passenger "autos" you own. This includes those private passenger "autos" you acquire ownership of after the policy begins. |
| 4 | Owned "Autos" Other Than Private Passenger "Autos" Only | Only those "autos" you own that are not of the private passenger type (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" not of the private passenger type you acquire ownership of after the policy begins. |
| 5 | Owned "Autos" Subject To No-Fault | Only those "autos" you own that are required to have No-Fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are required to have No-Fault benefits in the state where they are licensed or principally garaged. |
| 6 | Owned "Autos" Subject To A Compulsory Uninsured Motorists Law | Only those "autos" you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement. |
| 7 | Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to any power unit described in Item Three). |
| 8 | Hired "Autos" Only | Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent, or borrow from any of your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households. |
| 9 | Nonowned "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company), or members of their households but only while used in your business or your personal affairs. |

**B. Owned Autos You Acquire After The Policy Begins**

1. If Symbols **1, 2, 3, 4, 5** or **6** are entered next to a coverage in Item Two of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

2. But, if Symbol **7** is entered next to a coverage in Item Two of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

   a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

   b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

**C. Certain Trailers, Mobile Equipment And Temporary Substitute Autos**

If Liability Coverage is provided by this Coverage Form, the following types of vehicles are also covered "autos" for Liability Coverage:

1. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

2. "Mobile equipment" while being carried or towed by a covered "auto".

3. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

   a. Breakdown;

   b. Repair;

   c. Servicing;

   d. "Loss"; or

   e. Destruction.

**SECTION II - LIABILITY COVERAGE**

**A. Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

1. **Who Is An Insured**

   The following are "insureds":

   a. You for any covered "auto".

   b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

      (1) The owner or anyone else from whom you hire or borrow a covered "auto". This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.

      (2) Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.

      (3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

      (4) Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from a covered "auto".

      (5) A partner (if you are a partnership), or a member (if you are a limited liability company) for a covered "auto" owned by him or her or a member of his or her household.

    © ISO Properties, Inc., 2000    CA 00 01 10 01    ▯

c. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

**2. Coverage Extensions**

**a. Supplementary Payments**

In addition to the Limit of Insurance, we will pay for the "insured":

(1) All expenses we incur.

(2) Up to $2,000 for cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

(3) The cost of bonds to release attachments in any "suit" against the "insured" we defend, but only for bond amounts within our Limit of Insurance.

(4) All reasonable expenses incurred by the "insured" at our request, including actual loss of earnings up to $250 a day because of time off from work.

(5) All costs taxed against the "insured" in any "suit" against the "insured" we defend.

(6) All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the "insured" we defend, but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

**b. Out-Of-State Coverage Extensions**

While a covered "auto" is away from the state where it is licensed we will:

(1) Increase the Limit of Insurance for Liability Coverage to meet the limits specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

(2) Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of loss because of these extensions.

**B. Exclusions**

This insurance does not apply to any of the following:

**1. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured".

**2. Contractual**

Liability assumed under any contract or agreement.

But this exclusion does not apply to liability for damages:

a. Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

b. That the "insured" would have in the absence of the contract or agreement.

**3. Workers' Compensation**

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

**4. Employee Indemnification And Employer's Liability**

"Bodily injury" to:

a. An "employee" of the "insured" arising out of and in the course of:

(1) Employment by the "insured"; or

(2) Performing the duties related to the conduct of the "insured-s" business; or

b. The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph a. above.

This exclusion applies:

(1) Whether the "insured" may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract". For the purposes of the Coverage Form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

5. **Fellow Employee**

"Bodily injury" to any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business.

6. **Care, Custody Or Control**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

7. **Handling Of Property**

"Bodily injury" or "property damage" resulting from the handling of property:

a. Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

b. After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

8. **Movement Of Property By Mechanical Device**

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

9. **Operations**

"Bodily injury" or "property damage" arising out of the operation of any equipment listed in Paragraphs 6.b. and 6.c. of the definition of "mobile equipment".

10. **Completed Operations**

"Bodily injury" or "property damage" arising out of your work after that work has been completed or abandoned.

In this exclusion, your work means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Paragraphs a. or b. above.

Your work will be deemed completed at the earliest of the following times:

(1) When all of the work called for in your contract has been completed.

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

11. **Pollution**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a. That are, or that are contained in any property that is:

(1) Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

(2) Otherwise in the course of transit by or on behalf of the "insured"; or

(3) Being stored, disposed of, treated or processed in or upon the covered "auto";

b. Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

c. After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph a. above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

(1) The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

(2) The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs 6.b. and 6.c. of the definition of "mobile equipment".

    © ISO Properties, Inc., 2000    CA 00 01 10 01    □

Paragraphs **b.** and **c.** above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

(1) The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

(2) The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**12. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**13. Racing**

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

**C. Limit Of Insurance**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined, resulting from any one "accident" is the Limit of Insurance for Liability Coverage shown in the Declarations.

All "bodily injury", "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form and any Medical Payments Coverage Endorsement, Uninsured Motorists Coverage Endorsement or Underinsured Motorists Coverage Endorsement attached to this Coverage Part.

**SECTION III - PHYSICAL DAMAGE COVERAGE**

**A. Coverage**

1. We will pay for "loss" to a covered "auto" or its equipment under:

   **a. Comprehensive Coverage**

   From any cause except:

   (1) The covered "auto's" collision with another object; or

   (2) The covered "auto's" overturn.

   **b. Specified Causes Of Loss Coverage**

   Caused by:

   (1) Fire, lightning or explosion;

   (2) Theft;

   (3) Windstorm, hail or earthquake;

   (4) Flood;

   (5) Mischief or vandalism; or

   (6) The sinking, burning, collision or derailment of any conveyance transporting the covered "auto".

   **c. Collision Coverage**

   Caused by:

   (1) The covered "auto's" collision with another object; or

   (2) The covered "auto's" overturn.

2. **Towing**

   We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the private passenger type is disabled. However, the labor must be performed at the place of disablement.

3. **Glass Breakage - Hitting A Bird Or Animal - Falling Objects Or Missiles**

   If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

   **a.** Glass breakage;

   **b.** "Loss" caused by hitting a bird or animal; and

   **c.** "Loss" caused by falling objects or missiles.

   However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

### 4. Coverage Extensions

#### a. Transportation Expenses

We will pay up to $20 per day to a maximum of $600 for temporary transportation expense incurred by you because of the total theft of a covered "auto" of the private passenger type. We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss".

#### b. Loss Of Use Expenses

For Hired Auto Physical Damage, we will pay expenses for which an "insured" becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver, under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

(1) Other than collision only if the Declarations indicate that Comprehensive Coverage is provided for any covered "auto";

(2) Specified Causes Of Loss only if the Declarations indicate that Specified Causes Of Loss Coverage is provided for any covered "auto"; or

(3) Collision only if the Declarations indicate that Collision Coverage is provided for any covered "auto".

However, the most we will pay for any expenses for loss of use is $20 per day, to a maximum of $600.

### B. Exclusions

1. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

#### a. Nuclear Hazard

(1) The explosion of any weapon employing atomic fission or fusion; or

(2) Nuclear reaction or radiation, or radioactive contamination, however caused.

#### b. War Or Military Action

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2. We will not pay for "loss" to any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to any covered "auto" while that covered "auto" is being prepared for such a contest or activity.

3. We will not pay for "loss" caused by or resulting from any of the following unless caused by other "loss" that is covered by this insurance:

#### a. Wear and tear, freezing, mechanical or electrical breakdown.

#### b. Blowouts, punctures or other road damage to tires.

4. We will not pay for "loss" to any of the following:

#### a. Tapes, records, discs or other similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

#### b. Any device designed or used to detect speed measuring equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed measurement equipment.

#### c. Any electronic equipment, without regard to whether this equipment is permanently installed, that receives or transmits audio, visual or data signals and that is not designed solely for the reproduction of sound.

#### d. Any accessories used with the electronic equipment described in Paragraph c. above.

© ISO Properties, Inc., 2000
CA 00 01 10 01     □

Exclusions **4.c.** and **4.d.** do not apply to:

**a.** Equipment designed solely for the reproduction of sound and accessories used with such equipment, provided such equipment is permanently installed in the covered "auto" at the time of the "loss" or such equipment is removable from a housing unit which is permanently installed in the covered "auto" at the time of the "loss", and such equipment is designed to be solely operated by use of the power from the "auto's" electrical system, in or upon the covered "auto"; or

**b.** Any other electronic equipment that is:

(1) Necessary for the normal operation of the covered "auto" or the monitoring of the covered "auto's" operating system; or

(2) An integral part of the same unit housing any sound reproducing equipment described in **a.** above and permanently installed in the opening of the dash or console of the covered "auto" normally used by the manufacturer for installation of a radio.

**5.** We will not pay for "loss" to a covered "auto" due to "diminution in value".

**C. Limit Of Insurance**

**1.** The most we will pay for "loss" in any one "accident" is the lesser of:

**a.** The actual cash value of the damaged or stolen property as of the time of the "loss"; or

**b.** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

**2.** An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total "loss".

**3.** If a repair or replacement results in better than like kind or quality, we will not pay for the amount of the betterment.

**D. Deductible**

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

**SECTION IV - BUSINESS AUTO CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions:

**A. Loss Conditions**

**1. Appraisal For Physical Damage Loss**

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Accident, Claim, Suit Or Loss**

We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**a.** In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss". Include:

(1) How, when and where the "accident" or "loss" occurred;

(2) The "insured's" name and address; and

(3) To the extent possible, the names and addresses of any injured persons and witnesses.

**b.** Additionally, you and any other involved "insured" must:

(1) Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

(2) Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit".

(4) Authorize us to obtain medical records or other pertinent information.

    (5) Submit to examination, at our expense, by physicians of our choice, as often as we reasonably require.

  **c.** If there is "loss" to a covered "auto" or its equipment you must also do the following:

    (1) Promptly notify the police if the covered "auto" or any of its equipment is stolen.

    (2) Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

    (3) Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

    (4) Agree to examinations under oath at our request and give us a signed statement of your answers.

**3. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form until:

  **a.** There has been full compliance with all the terms of this Coverage Form; and

  **b.** Under Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

**4. Loss Payment - Physical Damage Coverages**

At our option we may:

  **a.** Pay for, repair or replace damaged or stolen property;

  **b.** Return the stolen property, at our expense. We will pay for any damage that results to the "auto" from the theft; or

  **c.** Take all or any part of the damaged or stolen property at an agreed or appraised value.

If we pay for the "loss", our payment will include the applicable sales tax for the damaged or stolen property.

**5. Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

**B. General Conditions**

  **1. Bankruptcy**

    Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligations under this Coverage Form.

  **2. Concealment, Misrepresentation Or Fraud**

    This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:

    **a.** This Coverage Form;

    **b.** The covered "auto";

    **c.** Your interest in the covered "auto"; or

    **d.** A claim under this Coverage Form.

  **3. Liberalization**

    If we revise this Coverage Form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

  **4. No Benefit To Bailee - Physical Damage Coverages**

    We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form.

  **5. Other Insurance**

    **a.** For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance. However, while a covered "auto" which is a "trailer" is connected to another vehicle, the Liability Coverage this Coverage Form provides for the "trailer" is:

      (1) Excess while it is connected to a motor vehicle you do not own.

      (2) Primary while it is connected to a covered "auto" you own.

    **b.** For Hired Auto Physical Damage Coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

    **c.** Regardless of the provisions of Paragraph **a.** above, this Coverage Form's Liability Coverage is primary for any liability assumed under an "insured contract".

© ISO Properties, Inc., 2000   CA 00 01 10 01   ☐

**d.** When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

**6. Premium Audit**

**a.** The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

**b.** If this policy is issued for more than one year, the premium for this Coverage Form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

**7. Policy Period, Coverage Territory**

Under this Coverage Form, we cover "accidents" and "losses" occurring:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

The coverage territory is:

**a.** The United States of America;

**b.** The territories and possessions of the United States of America;

**c.** Puerto Rico;

**d.** Canada; and

**e.** Anywhere in the world if:

**(1)** A covered "auto" of the private passenger type is leased, hired, rented or borrowed without a driver for a period of 30 days or less; and

**(2)** The "insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico, or Canada or in a settlement we agree to.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

**8. Two Or More Coverage Forms Or Policies Issued By Us**

If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "accident", the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

**SECTION V - DEFINITIONS**

**A.** "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

**B.** "Auto" means a land motor vehicle, "trailer" or semitrailer designed for travel on public roads but does not include "mobile equipment".

**C.** "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

**D.** "Covered pollution cost or expense" means any cost or expense arising out of:

**1.** Any request, demand, order or statutory or regulatory requirement; or

**2.** Any claim or "suit" by or on behalf of a governmental authority demanding

that the "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a.** That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled, or handled for movement into, onto or from the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured";

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

   **(1)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

   **(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** or **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

   **(1)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

   **(2)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**E.** "Diminution in value" means the actual or perceived loss in market value or resale value which results from a direct and accidental "loss".

**F.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**G.** "Insured" means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

**H.** "Insured contract" means:

   **1.** A lease of premises;

   **2.** A sidetrack agreement;

   **3.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   **4.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   **5.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

   **6.** That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

An "insured contract" does not include that part of any contract or agreement:

   **a.** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing; or

   **b.** That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

   **c.** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

**I.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**J.** "Loss" means direct and accidental loss or damage.

K. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to premises you own or rent;

3. Vehicles that travel on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    a. Power cranes, shovels, loaders, diggers or drills; or

    b. Road construction or resurfacing equipment such as graders, scrapers or rollers.

5. Vehicles not described in Paragraphs 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    a. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    b. Cherry pickers and similar devices used to raise or lower workers.

6. Vehicles not described in Paragraphs 1., 2., 3. or 4. above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    a. Equipment designed primarily for:

        (1) Snow removal;

        (2) Road maintenance, but not construction or resurfacing; or

        (3) Street cleaning;

    b. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

L. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

M. "Property damage" means damage to or loss of use of tangible property.

N. "Suit" means a civil proceeding in which:

1. Damages because of "bodily injury" or "property damage"; or

2. A "covered pollution cost or expense",

to which this insurance applies, are alleged.

"Suit" includes:

    a. An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or

    b. Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the insured submits with our consent.

O. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

P. "Trailer" includes semitrailer.

Case 2:07-cv-00216-MEF-TFM     Document 22     Filed 07/20/2007     Page 30 of 44

COMMERCIAL AUTO
CA 99 03 07 97

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AUTO MEDICAL PAYMENTS COVERAGE

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A. Coverage**

We will pay reasonable expenses incurred for necessary medical and funeral services to or for an "insured" who sustains "bodily injury" caused by "accident". We will pay only those expenses incurred, for services rendered within three years from the date of the "accident".

**B. Who Is An Insured**

1. You while "occupying" or, while a pedestrian, when struck by any "auto".

2. If you are an individual, any "family member" while "occupying" or, while a pedestrian, when struck by any "auto".

3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, loss or destruction.

**C. Exclusions**

This insurance does not apply to any of the following:

1. "Bodily injury" sustained by an "insured" while "occupying" a vehicle located for use as a premises.

2. "Bodily injury" sustained by you or any "family member" while "occupying" or struck by any vehicle (other than a covered "auto") owned by you or furnished or available for your regular use.

3. "Bodily injury" sustained by any "family member" while "occupying" or struck by any vehicle (other than a covered "auto") owned by or furnished or available for the regular use of any "family member".

4. "Bodily injury" to your "employee" arising out of and in the course of employment by you. However, we will cover "bodily injury" to your domestic "employees" if not entitled to workers' compensation benefits. For the purposes of this endorsement, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

5. "Bodily injury" to an "insured" while working in a business of selling, servicing, repairing or parking "autos" unless that business is yours.

6. "Bodily injury" caused by declared or undeclared war or insurrection or any of their consequences.

7. "Bodily injury" to anyone using a vehicle without a reasonable belief that the person is entitled to do so.

8. "Bodily Injury" sustained by an "insured" while "occupying" any covered "auto" while used in any professional racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply to any "bodily injury" sustained by an "insured" while the "auto" is being prepared for such a contest or activity.

**D. Limit Of Insurance**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for "bodily injury" for each "insured" injured in any one "accident" is the Limit Of Insurance for Auto Medical Payments Coverage shown in the Declarations.

No one will be entitled to receive duplicate payments for the same elements of "loss" under this coverage and any Liability Coverage Form, Uninsured Motorists Coverage Endorsement or Underinsured Motorists Coverage Endorsement attached to this Coverage Part.

Copyright, Insurance Services Office, Inc., 1996

**E.  Changes In Conditions**

The Conditions are changed for Auto Medical Payments Coverage as follows:

1.  The Transfer Of Rights Of Recovery Against Others To Us Condition does not apply.

2.  The reference in Other Insurance in the Business Auto and Garage Coverage Forms and Other Insurance - Primary And Excess Insurance Provisions in the Truckers and Motor Carrier Coverage Forms to "other collectible insurance" applies only to other collectible auto medical payments insurance.

**F.  Additional Definitions**

As used in this endorsement:

1.  "Family member" means a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child.

2.  "Occupying" means in, upon, getting in, on, out or off.

          Copyright, Insurance Services Office, Inc., 1996          CA 99 03 07 97   ☐

POLICY NUMBER: BAP  4896511-02

COMMERCIAL AUTO
CA 03 01 12 93

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DEDUCTIBLE LIABILITY COVERAGE

This endorsement modifies insurance provided under the following:

> BUSINESS AUTO COVERAGE FORM
> GARAGE COVERAGE FORM
> MOTOR CARRIER COVERAGE FORM
> TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement effective | |
|---|---|
| Named Insured | Countersigned by |

(Authorized Representative)

## SCHEDULE

| | | | |
|---|---|---|---|
| Liability Deductible: | $ | 5,000 | Per "Accident" |
| "Bodily Injury" Deductible: | $ | | Per Person |
| | $ | | Per "Accident" |
| "Property Damage" Deductible: | $ | | Per "Accident" |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

LIABILITY COVERAGE is changed as follows:

**A.  LIABILITY COVERAGE DEDUCTIBLE**

The damages caused in any one "accident" that would otherwise be payable under LIABILITY COVERAGE will be reduced by the Liability Deductible shown in the Schedule prior to the application of the LIMIT OF INSURANCE provision.

**B.  BODILY INJURY LIABILITY COVERAGE DEDUCTIBLES**

1.  **Per Person**

The damages that would otherwise be payable under LIABILITY COVERAGE FOR "bodily injury" sustained by any one person, in any one "accident", will be reduced by the "Bodily Injury" Per Person Deductible shown in the Schedule prior to the application of the LIMIT OF INSURANCE provision.

2.  **Per Accident**

The damages that would otherwise be payable under LIABILITY COVERAGE for all "bodily injury" caused in any one "accident" will be reduced by the "Bodily Injury" Per "Accident" Deductible shown in the Schedule prior to the application of the LIMIT OF INSURANCE provision.

**C.  PROPERTY DAMAGE LIABILITY COVERAGE DEDUCTIBLE**

The damages that would otherwise be payable under LIABILITY COVERAGE FOR "property damage" caused in any one "accident" will be reduced by the "Property Damage" Per "Accident" Deductible shown in the Schedule prior to the application of the LIMIT OF INSURANCE provision.

**D.  OUR RIGHT TO REIMBURSEMENT**

To settle any claim or "suit" we may pay all or any part of any deductible shown in the Schedule. If this happens, you must reimburse us for the deductible or the part of the deductible we paid.

CA 03 01 12 93

Copyright, Insurance Services Office, Inc., 1993

☐

POLICY NUMBER:BAP 4896511-02

COMMERCIAL AUTO
CA 21 59 12 02

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ALABAMA UNINSURED MOTORISTS COVERAGE

For a covered "auto" licensed or principally garaged in, or "garage operations" conducted in Alabama, this endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Effective: | Countersigned By: |
|---|---|
| Named Insured: | (Authorized Representative) |

### SCHEDULE

| LIMIT OF INSURANCE | |
|---|---|
| $  1,000,000 | Each "Accident" |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

### A. Coverage

1. We will pay all sums the "insured" is legally entitled to recover as damages from the owner or driver of an "uninsured motor vehicle". The damages must result from "bodily injury" sustained by the "insured" caused by an "accident". The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "uninsured motor vehicle".

2. No judgment for damages arising out of a "suit" brought against the owner or operator of an "uninsured motor vehicle" is binding on us unless we:

   a. Received reasonable notice of the pendency of the "suit" resulting in the judgment; and

   b. Had a reasonable opportunity to protect our interest in the "suit".

However, if reasonable notice has not been given to us, we have the option to accept the judgment in the suit as binding on us.

### B. Who Is An Insured

If the Named Insured is designated in the Declarations as:

1. An individual, then the following are "insureds":

   a. The Named Insured and any "family members".

   b. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

   c. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

2. A partnership, limited liability company, corporation or any other form of organization, then the following are "insureds":

  **a.** Anyone "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

  **b.** Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

**C. Exclusions**

This insurance does not apply to:

1. Any claim settled without our consent.

  However, this exclusion does not apply to a settlement made with the insurer of a vehicle described in Paragraph **b.** of the definition of "uninsured motor vehicle".

2. The direct or indirect benefit of any insurer or self-insurer under any workers' compensation, disability benefits or similar law.

3. Anyone using a vehicle without a reasonable belief that the person is entitled to do so.

**D. Limit Of Insurance**

1. Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the accident, the most we will pay for all damages resulting from any one "accident" is the limit of Uninsured Motorists Insurance shown in the declarations. If there is more than one covered "auto", our limit of insurance for any one "accident" is the sum of the limits applicable to each covered "auto", subject to a maximum of three covered "autos".

2. No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form and any Liability Coverage Form or Medical Payments Coverage Endorsement attached to this Coverage Part.

  We will not make a duplicate payment under this Coverage Form for any element of "loss" for which payment has been made by or for anyone who is legally responsible.

  We will not pay for any element of "loss" if a person is entitled to receive payment for the same element of "loss" under any workers' compensation, disability benefits or similar law.

3. We will reduce the "insured's" total damages by any amount available to that "insured", under any bodily injury liability bonds or policies applicable to the vehicle described in Paragraph **b.** of the definition of "uninsured motor vehicle", that such "insured" did not recover as a result of a settlement between that "insured" and the insurer of such vehicle. However, any reduction of the "insured's" total damages will not reduce the limit of liability for this coverage.

  This Paragraph (**D.3.**) shall not apply if we advance payment to the "insured" in an amount equal to the tentative settlement with the insurer of the vehicle described in Paragraph **b.** of the definition of "uninsured motor vehicle".

**E. Changes In Conditions**

The conditions are changed for Uninsured Motorists Coverage as follows:

1. **The reference in Other Insurance in the Business Auto and Garage Coverage Forms and Other Insurance - Primary And Excess Insurance Provisions in the Truckers and Motor Carrier Coverage Forms to "other collectible insurance" applies only to other collectible uninsured motorists insurance.**

2. **Duties In The Event Of Accident, Claim, Suit Or Loss is changed by adding the following:**

  **a.** Promptly notify the police if a hit-and-run driver is involved, and

  **b.** Promptly send us copies of the legal papers if a "suit" is brought.

  **c.** A person seeking Uninsured Motorists Coverage must also promptly notify us in writing of a tentative settlement between the "insured" and the insurer of a vehicle described in Paragraph **b.** of the definition of "uninsured motor vehicle" and allow us 30 days to advance payment to that insured in an amount equal to the tentative settlement to preserve our rights against the insurer, owner or operator of such a vehicle described in Paragraph **b.** of the definition of "uninsured motor vehicle".

© ISO Properties, Inc., 2002

CA 21 59 12 02    ☐

**3. Transfer Of Rights Of Recovery Against Others To Us** is changed by adding the following:

Our rights do not apply under this provision with respect to damages caused by an "accident" with a vehicle described in Paragraph **b.** of the definition of "uninsured motor vehicle" if we:

   **a.** Have been given prompt written notice of a tentative settlement between an "insured" and the insurer of a vehicle described in Paragraph **b.** of the definition of "uninsured motor vehicle"; and

   **b.** Fail to advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification.

If we advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification:

   **a.** That payment will be separate from any amount the "insured" is entitled to recover under the provisions of Uninsured Motorists Coverage; and

   **b.** We have a right to recover the advanced payment.

If we make any payment and the "insured" recovers from another party, the "insured" shall hold the proceeds in trust for us and pay us back the amount we have paid.

**4.** The **Two Or More Coverage Forms Or Policies Issued By Us** General Condition does not apply to an individual Named Insured or any "family member".

**5.** THE FOLLOWING CONDITION IS ADDED:

ARBITRATION

   **A.** IF WE AND AN "INSURED" DISAGREE WHETHER THE "INSURED" IS LEGALLY ENTITLED TO RECOVER DAMAGES FROM THE OWNER OR DRIVER OF AN "UNINSURED MOTOR VEHICLE" OR DO NOT AGREE AS TO THE AMOUNT OF DAMAGES THAT ARE RECOVERABLE BY THAT "INSURED", THEN THE MATTER MAY BE ARBITRATED. HOWEVER, DISPUTES CONCERNING COVERAGE UNDER THIS ENDORSEMENT MAY NOT BE ARBITRATED. BOTH PARTIES MUST AGREE TO ARBITRATION. IF SO AGREED, EACH PARTY WILL SELECT AN ARBITRATOR. THE TWO ARBITRATORS WILL SELECT A THIRD. IF THEY CANNOT AGREE WITHIN 30 DAYS, EITHER MAY REQUEST THAT SELECTION BE MADE BY A JUDGE OF A COURT HAVING JURISDICTION. THE ARBITRATION PROCEEDINGS SHALL COMMENCE WITHIN ONE YEAR AFTER THE DATE BOTH PARTIES AGREE TO SETTLE A DISPUTE BY ARBITRATION. ARBITRATION EXPENSES WILL BE DETERMINED BY THE ARBITRATOR ACCORDING TO ALABAMA LAW.

   UNLESS BOTH PARTIES AGREE OTHERWISE, ARBITRATION WILL TAKE PLACE IN THE COUNTY IN WHICH THE "INSURED" LIVES. LOCAL RULES OF LAW AS TO ARBITRATION PROCEDURE AND EVIDENCE WILL APPLY. A DECISION AGREED TO BY TWO OF THE ARBITRATORS WILL BE BINDING.

   **B.** THIS ARBITRATION PROVISION WILL NOT APPLY IF LEGAL ACTION HAS BEEN COMMENCED BY THE "INSURED" AGAINST THE OWNER OR OPERATOR OF AN "UNINSURED MOTOR VEHICLE".

**F. Additional Definitions**

As used in this endorsement:

1. "Family member" means a person related to an individual Named Insured by blood, marriage or adoption who is a resident of such Named Insured's household, including a ward or foster child.

2. "Occupying" means in, upon, getting in, on, out or off.

3. "Uninsured motor vehicle" means a land motor vehicle or "trailer":

   a. For which no liability bond or policy at the time of an "accident" provides at least the amounts required by the applicable law where a covered "auto" is principally garaged;

   b. That is an underinsured motor vehicle. An underinsured motor vehicle is a land motor vehicle or "trailer" for which the sum of all liability bonds or policies at the time of an "accident" provides a limit that is less than the amount an "insured" is legally entitled to recover as damages caused by the "accident";

   c. For which an insuring or bonding company denies coverage or is or becomes insolvent; or

   d. That is a hit-and-run vehicle and neither the driver nor owner can be identified. The vehicle must either:

      (1) Hit an "insured", a covered "auto" or a vehicle an "insured" is "occupying"; or

      (2) Cause "bodily injury" to an "insured" without hitting an "insured", a covered "auto" or a vehicle an "insured" is "occupying".

However, "uninsured motor vehicle" does not include any vehicle:

   a. Owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer who is or becomes insolvent and cannot provide the amounts required by that motor vehicle law;

   b. Designed for use mainly off public roads while not on public roads.

    © ISO Properties, Inc., 2002    CA 21 59 12 02    □

COMMERCIAL AUTO
CA 00 38 12 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WAR EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
SINGLE INTEREST AUTOMOBILE PHYSICAL DAMAGE INSURANCE POLICY
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A. Changes In Liability Coverage**

The War exclusion under Paragraph **B. Exclusions of Section II – Liability Coverage** is replaced by the following:

**WAR**

"Bodily injury", "property damage" or "covered pollution cost or expense" arising directly or indirectly, out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**B. Changes In Garagekeepers Coverage**

If the Garagekeepers Coverage endorsement or the Garagekeepers Coverage – Customers' Sound Receiving Equipment endorsement is attached, the following exclusion is added:

We will not pay for "loss" caused by or resulting from the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss":

**WAR**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**C. Changes In Auto Medical Payments**

If the Auto Medical Payments Coverage endorsement is attached, then Exclusion **C.6.** is replaced by the following:

**6.** "Bodily injury", arising directly or indirectly, out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**D. Changes In Uninsured/Underinsured Motorists Coverage**

If Uninsured and/or Underinsured Motorists Coverage is attached, then the following exclusion is added:

This insurance does not apply to:

**WAR**

**1.** "Bodily injury" or "property damage", if applicable, arising directly or indirectly, out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

### E. Changes In Personal Injury Protection Coverage

1. If Personal Injury Protection, no-fault, or other similar coverage is attached, and:

   a. Contains, in whole or in part, a War exclusion, that exclusion is replaced by Paragraph **2.**

   b. Does not contain a war exclusion, Paragraph **2.** is added.

2. This insurance does not apply to:

   **WAR**

   "Bodily injury" or "property damage", if applicable, arising directly or indirectly, out of:

   a. War, including undeclared or civil war;

   b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

### F. Changes In Single Interest Automobile Physical Damage Insurance Policy

The War exclusion is replaced by the following:

   a. War, including undeclared or civil war;

   b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

© ISO Properties, Inc., 2003

CA 00 38 12 02    □

POLICY NUMBER: BAP 4896511-02                                COMMERCIAL AUTO
                                                             CA 20 01 10 01

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LESSOR – ADDITIONAL INSURED AND LOSS PAYEE

This endorsement modifies insurance provided under the following:

   BUSINESS AUTO COVERAGE FORM
   BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
   GARAGE COVERAGE FORM
   MOTOR CARRIER COVERAGE FORM
   TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Effective: | Countersigned By: |
|---|---|
| Named Insured: | (Authorized Representative) |

**SCHEDULE**

| | |
|---|---|
| Insurance Company | ZURICH AMERICAN INSURANCE COMPANY |
| Policy Number | BAP 4896511-02 |
| Effective Date | 06-01-05 |
| Expiration Date | 06-01-06 |
| Named Insured Address | BOAN CONTRACTING CO., INC.<br>P.O. BOX 778<br>GREENVILLE                          AL      36037 |
| Additional Insured (Lessor) Address | ALL LESSORS |
| Designation or Description of "Leased Autos" | ANY LEASED VEHICLE |

| Coverages | Limit Of Insurance |
|---|---|
| Liability | 1000000        Each "Accident" |
| Personal Injury Protection (or equivalent no-fault coverage) | |
| Comprehensive | ACTUAL CASH VALUE OR COST OF REPAIR WHICHEVER IS LESS;<br>MINUS:          1000      For Each Covered "Leased Auto" |
| Collision | ACTUAL CASH VALUE OR COST OF REPAIR WHICHEVER IS LESS;<br>MINUS:          1000      For Each Covered "Leased Auto" |
| Specified Causes of Loss | ACTUAL CASH VALUE OR COST OF REPAIR WHICHEVER IS LESS;<br>MINUS:                    For Each Covered "Leased Auto" |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

## A. Coverage

1. Any "leased auto" designated or described in the Schedule will be considered a covered "auto" you own and not a covered "auto" you hire or borrow. For a covered "auto" that is a "leased auto" **Who Is An Insured** is changed to include as an "insured" the lessor named in the Schedule.

2. The coverages provided under this endorsement apply to any "leased auto" described in the Schedule until the expiration date shown in the Schedule, or when the lessor or his or her agent takes possession of the "leased auto", whichever occurs first.

## B. Loss Payable Clause

1. We will pay, as interest may appear, you and the lessor named in this endorsement for "loss" to a "leased auto".

2. The insurance covers the interest of the lessor unless the "loss" results from fraudulent acts or omissions on your part.

3. If we make any payment to the lessor, we will obtain his or her rights against any other party.

## C. Cancellation

1. If we cancel the policy, we will mail notice to the lessor in accordance with the Cancellation Common Policy Condition.

2. If you cancel the policy, we will mail notice to the lessor.

3. Cancellation ends this agreement.

## D. The lessor is not liable for payment of your premiums.

## E. Additional Definition

As used in this endorsement:

"Leased auto" means an "auto" leased or rented to you, including any substitute, replacement or extra "auto" needed to meet seasonal or other needs, under a leasing or rental agreement that requires you to provide direct primary insurance for the lessor.

     © ISO Properties, Inc., 2000     CA 20 01 10 01     ☐

COMMERCIAL AUTO
CA 99 44 12 93

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE CLAUSE

This endorsement modifies insurance provided under the following:

**BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM**

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** We will pay, as interest may appear, you and the loss payee named in the policy for "loss" to a covered "auto".

**B.** The insurance covers the interest of the loss payee unless the "loss" results from conversion, secretion or embezzlement on your part.

**C.** We may cancel the policy as allowed by the CANCELLATION Common Policy Condition.

Cancellation ends this agreement as to the loss payee's interest.  If we cancel the policy we will mail you and the loss payee the same advance notice.

**D.** If we make any payments to the loss payee, we will obtain his or her rights against any other party.

CA 99 44 12 93                    Copyright, Insurance Services Office, Inc., 1993                    ☐

POLICY NUMBER: BAP 4896511-02

COMMERCIAL AUTO
CA 99 54 07 97

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COVERED AUTO DESIGNATION SYMBOL

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below:

| Endorsement Effective: | Countersigned By: |
|---|---|
| Named Insured: | (Authorized Representative) |

**Section I – Covered Autos** is amended by adding the following:

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols may be used (in addition to the numerical symbols described in the Coverage Form) to describe the "autos" that may be covered "autos". The entry of one of these symbols next to a coverage on the Declarations will designate the only "autos" that are covered "autos".

| Symbol | | Description Of Covered Auto Designation Symbols |
|---|---|---|
| | | For use with the Business Auto Coverage Form |
| 10 | = | AUTOMATIC PHYSICAL DAMAGE COVERAGE FOR VEHICLES 1990 AND NEWER |
| | | For use with the Garage Coverage Form |
| 32 | = | |
| | | For use with the Truckers Coverage Form |
| 51 | = | |
| 52 | = | |

CA 99 54 07 97          Copyright, Insurance Services Office, Inc., 1997          Page 1 of 2

| Symbol | | Description Of Covered Auto Designation Symbols |
|--------|---|---|
| | | For use with the Business Auto Physical Damage Coverage Form |
| 7 | = | |
| | | |
| | | For use with the Motor Carrier Coverage Form |
| 72 | = | |
| 73 | = | |

Copyright, Insurance Services Office, Inc., 1997          CA 99 54 07 97     □

# Commercial Auto Insurance
### Endorsement


**ZURICH**

Insurance for this coverage is provided by:
ZURICH AMERICAN INSURANCE COMPANY

Policy Number:   BAP 4896511-02

Renewal of Number:   BAP 4896511-01

### PHYSICAL DAMAGE DEDUCTIBLES ENDORSEMENT

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED BY THE FOLLOWING:
BUSINESS AUTO COVERAGE FORM

SCHEDULE OF PHYSICAL DAMAGE DEDUCTIBLES

| COVERAGE | VEHICLE DESCRIPTION | DEDUCTIBLE |
|---|---|---|
| COMPREHENSIVE AND COLLISION | PRIVATE PASSENGER (COST NEW UNDER $75,000) LIGHT TRUCKS & TRAILERS | $1,000 |
| COMPREHENSIVE AND COLLISION | PRIVATE PASSENGER (COST NEW $75,000 & OVER) MEDIUM TRUCKS | $2,000 |
| COMPREHENSIVE AND COLLISION | HEAVY TRUCKS, EXTRA HEAVY TRUCKS & TRUCK TRACTORS | $3,000 |

U-CA-388-A (7/94)

# EXHIBIT 2

1

1      IN THE UNITED STATES DISTRICT COURT FOR

2        THE MIDDLE DISTRICT OF ALABAMA

3           NORTHERN DIVISION

4

5    CASE NUMBER:  2:07-CV-216-MEF

6

7    ZURICH AMERICAN INSURANCE COMPANY,

8         Plaintiff,

9         vs.

10   JUNIORETTE GRIFFIN SMITH, as Administratrix of

11   the Estate of Dale Smith, deceased,

12        Defendant.

13

14     *  *  *  *  *  *  *  *  *  *

15

16       The deposition of Juniorette Griffin

17   Smith, taken pursuant to Alabama Rules of

18   Civil Procedure before Sue Anne Casey, Court

19   Reporter and Notary Public, State at Large, at

20   the office of Woodard, Patel & Sledge, 1213

21   East Three Notch Street, Andalusia, Alabama on

22   the 5th day of March, 2008 commencing at

23   approximately 3:15 p.m.

2

```
 1              S T I P U L A T I O N

 2

 3              IT IS STIPULATED by and between

 4    Counsel for the parties that this deposition

 5    be taken at this time by Sue Anne Casey, Court

 6    Reporter and Notary Public, State at Large,

 7    who is to act as commissioner without formal

 8    issuance of commission to her; that said

 9    deposition be taken down stenographically,

10    transcribed and certified by the commissioner.

11

12              Except for objections as to the form

13    of the questions, no objections need be made

14    at the time of the taking of the deposition by

15    either party, but objections may be interposed

16    by either party at the time the deposition is

17    read into evidence, which shall be ruled upon

18    by the Court on the trial of the cause upon

19    the grounds of objection, then and there

20    assigned.

21

22              The reading and signing of the

23    deposition is waived.
```

3

```
 1              A P P E A R A N C E S

 2

 3

 4

 5    PLAINTIFF:

 6    By J. David Moore

 7    WALSTON, WELLS & BIRCHALL, LLP

 8    1819 Fifth Avenue North

 9    Suite 1100

10    Birmingham, AL   35203

11

12

13

14

15    DEFENDANT:

16    By Christopher M. Sledge

17    WOODARD, PATEL & SLEDGE

18    1213 East Three Notch Street

19    Andalusia, AL   36420

20

21

22

23
```

4

```
1                    I N D E X

2

3

4

5   EXAMINATION BY:                    PAGE NO:

6   Mr. Moore                             5

7

8

9

10

11

12              *   *   *   *   *   *   *   *   *

13

14

15

16

17                 E X H I B I T S

18

19

20      (Whereupon, no exhibits were marked.)

21

22

23
```

5

```
 1              JUNIORETTE GRIFFIN SMITH

 2         being first duly sworn, was examined

 3              and testified as follows:

 4

 5

 6    EXAMINATION BY MR. MOORE:

 7         Q.   Ms. Smith, my name is David Moore.

 8    We just met.  And I appreciate your coming in

 9    today to give your deposition for us in this

10    case.  Could you state your full name for the

11    record, please?

12         A.   Juniorette Griffin Smith.

13         Q.   And what is your address?

14         A.   25515 Highway 29 North, Andalusia,

15    Alabama 36421.

16         Q.   And how long have you lived at that

17    address?

18         A.   I've lived there about two years

19    now.  We lived there previously for about

20    twelve years.  It's a home property.

21         Q.   Okay.  In between there, was

22    there --

23         A.   We lived up the road about four
```

6

```
 1   miles.

 2        Q.   Okay.  Through the past -- How long

 3   have you lived in Andalusia?

 4        A.   Probably sixteen years.  Around

 5   sixteen years.

 6        Q.   What's your social security number,

 7   please, ma'am?

 8        A.   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.

 9        Q.   Thank you.  Ms. Smith, have you

10   ever given a deposition before?

11        A.   No, sir.

12        Q.   Okay.  I'm here to ask you

13   questions, and you've been sworn in as you

14   know.  I will try my best to ask questions

15   that are clear and short.  I will probably

16   fail several times.  If you don't understand

17   anything that I ask, please tell me.

18        A.   Yes, sir.

19        Q.   And I'll try to rephase it so that

20   we can all know that we're on the same page.

21   If you don't say anything to me, I'll assume

22   that you understood the question.  Is that

23   fair?
```

7

1      A.   Yes, sir.

2      Q.   If you need to take a break at any

3  time, please just say so, for any reason.

4  We're not here for an endurance test.   I'm

5  hopeful this won't take very long.   But just

6  let me know.   And I do want to say that I

7  anticipate we'll have to ask -- I'll have to

8  ask you some questions about the accident that

9  resulted in your late husband's death.   I'm

10  sorry to have to do that today.   I understand

11  that may be difficult for you.   And I will

12  understand.   So please just let me know if we

13  need to take a break at any time.

14      A.   Yes, sir.

15      Q.   Ms. Smith, have you reviewed any

16  particular documents in preparation to be

17  deposed today?

18      A.   What do you mean particular

19  documents?

20      Q.   Yes, ma'am.

21      A.   Such as --

22      Q.   Well, any correspondents or a copy

23  of the policy that's at issue, any papers at

8

```
1    all.

2         A.   No, sir.

3         Q.   Other than your lawyer, have you

4    discussed the claim under the Zurich policy at

5    issue with anyone in preparation of being

6    deposed today?

7         A.   No, sir.

8         Q.   Okay.  You are the widow of Roger

9    Dale Smith; correct?

10        A.   Yes, sir.

11        Q.   How long were you and Mr. Smith

12   married?

13        A.   Twenty-seven years.

14        Q.   So that puts your date of marriage

15   when?

16        A.   1978.

17        Q.   Do you have any children?

18        A.   Three children.

19        Q.   And what are their names?

20        A.   Griffin Lee Smith, Matthew Dale

21   Smith and Kelly Par Smith.

22        Q.   And how old are your children?

23        A.   Griffin is twenty-seven and Matthew
```

9

```
 1    will be twenty-five this month and Kelly is

 2    twenty-two.

 3         Q.   Do any of your children live here

 4    in Covington County?

 5         A.   Yes, sir.  Matthew and Kelly too.

 6         Q.   Where does Griffin live?

 7         A.   Griffin lives in Auburn.

 8         Q.   Where does Matthew work?

 9         A.   He works at Acrohelipro.

10         Q.   Okay.  Acrohelipro?

11         A.   Yes, sir.

12         Q.   What do they do there?

13         A.   He is a helicopter mechanic.

14         Q.   Is that located here in Andalusia?

15         A.   Between Andalusia and Opp, yes,

16    sir.

17         Q.   And what about Kelly?  Where does

18    she work?

19         A.   She's a full-time student and she

20    lives with me.

21         Q.   Where is she in school?

22         A.   LBW.

23         Q.   And where do you work, Ms. Smith?
```

10

```
1          A.    I work at Straughn Elementary
2     School.
3          Q.    Are you a teacher?
4          A.    Yes, sir.
5          Q.    I understood you were coming from
6     work today.
7          A.    Yes, sir.
8          Q.    We appreciate that very much.
9          What grade do you teach?
10         A.    First.
11         Q.    How long have you been a teacher
12    there at Straughn?
13         A.    This is my fifteenth year.
14         Q.    At the same school?
15         A.    Yes, sir.  Same grade.
16         Q.    Really?
17         A.    Yes, sir.
18         Q.    That's unusual too.  Well, that's
19    great.
20         A.    I love first grade.
21         Q.    I'm glad to hear that.  My son's
22    gonna be in first grade next year.  I hope he
23    gets lucky and had a teacher that loves first
```

11

```
 1   grade.

 2            Where did you go to high school?

 3        A.   Straughn High School.

 4        Q.   And you graduated when?

 5        A.   In 1978.

 6        Q.   And where did you go to college

 7   after that?

 8        A.   Troy State University.

 9        Q.   Do you still call it Troy State?

10        A.   I do.

11        Q.   I do too.  And when did you

12   graduate from Troy State?

13        A.   1991.

14        Q.   What's your degree in?

15        A.   Early childhood education.

16        Q.   Have you taken any post-graduate

17   courses or done any work in that regard?

18        A.   No, sir.

19        Q.   You have been appointed as the

20   administratrix of your husband's estate; is

21   that right?

22        A.   Yes, sir.

23        Q.   Can you recall when that was done?
```

12

```
 1        A.    I don't recall.

 2        Q.    That's quite all right.  That's

 3   another thing I should have mentioned.  If at

 4   any point if I ask you something and you don't

 5   remember, that's perfectly okay to just say I

 6   don't remember.  I'd rather you say that than

 7   to try to guess.

 8        A.    Yes, sir.

 9        Q.    Now, as the administratrix of Mr.

10   Smith's estate, you have made a claim for

11   uninsured or underinsured motorist benefits

12   under the insurance policy that was issued to

13   Mr. Smith's employer; is that right?

14        A.    Yes, sir.

15        Q.    And who was his employer?

16        A.    Boan Contracting Company,

17   Incorporated.

18        Q.    Have you ever seen a copy of that

19   insurance policy?

20        A.    No, sir.

21        Q.    Okay.  So you have never read it?

22        A.    No, sir.

23        Q.    To the best of your ability as you
```

13

1    sit here now -- I'm not trying to look for a

2    legal conclusion from you at all -- what is

3    your understanding of the basis for the claim

4    that Mr. Smith was entitled to coverage under

5    that policy?

6        A.   To the best of my knowledge, I

7    understand that uninsured motorist pays if

8    there's an accident resulting in death even if

9    the person was not in that vehicle.

10        Q.   That's your understanding about

11    what uninsured motorist coverage is in general

12    terms?

13        A.   Yes, sir.

14        Q.   And what is it -- What is your

15    understanding as to why Mr. Smith was entitled

16    to those general benefits under the policy

17    that was issued to Boan Contracting?

18        A.   I'm trying to word this the right

19    way.  Because he was an insured driver and had

20    a company truck that was just his truck that

21    he might be subject to get the insurance from

22    the uninsured motorist.

23        Q.   When you say "a company truck that

14

1 was just his truck", do you mean a truck that

2 was owned by Boan Contracting that was -- that

3 he typically drove?

4   A. Okay.  Yes, sir.  It was bought for

5 him, and he was the only one that had the

6 keys.  He was the foreman of the job.

7   Q. Right.  As far as you knew, no

8 other Boan employees drove that particular

9 Boan truck.

10   A. No.  He drove it back and forth

11 home, and on weekends, it would sit at the

12 house.

13   Q. Who owned the truck?

14   A. Boan Contracting owned the truck,

15 yes, sir.

16   Q. Now, we're here, ma'am, in a

17 deposition for a case that was filed

18 originally by Zurich Insurance Company.

19 You're aware of that; right?

20   A. (Witness nods head yes.)

21   Q. Do you understand that Zurich has

22 brought this lawsuit to ask the judge to

23 determine whether or not the claim that was

15

1    made under its policy issued to your husband's

2    employer is due to be paid?  Let me ask that a

3    better way.  Do you understand that Zurich is

4    not asking the Court to award any money or

5    damages from you to Zurich in this matter?

6        A.    Yes, sir.  I think I understand

7    that.

8        Q.    I'm sure you understand that;

9    right?

10        A.    Yes, sir.

11        Q.    I just want to make sure that we're

12    all on the same page.  You understand that

13    Zurich is not seeking any money or anything

14    like that from you?

15        A.    Yes, sir.

16        Q.    And is it correct that the claims

17    that you have made in this lawsuit are on

18    behalf of the your husband's estate as opposed

19    to on your behalf personally?

20        A.    Okay.  I don't know that I

21    understand that question.

22        Q.    Sure.  Do you have any complaints

23    against Zurich in this lawsuit on your own

16

1   behalf as opposed to as the administratrix of

2   your husband's estate?

3       A.   No, sir.

4       Q.   If I asked this already, I

5   apologize.  How long had your husband been

6   working for Boan?

7       A.   He had been working for Boan -- I

8   was pregnant with Matt -- twenty-two,

9   twenty-three years, something like that.

10      Q.   What was his job or his position at

11  the time of his accident?

12      A.   He was a foreman.  He had his own

13  crew that he ran.

14      Q.   Did he start out as a foreman

15  twenty-two years ago?

16      A.   No, sir.

17      Q.   What did he start out as?

18      A.   He worked at the shop and then

19  eventually started working on jobs and worked

20  his way up as a foreman.

21      Q.   How long had he been a foreman?

22      A.   I don't know exactly how many years

23  but for many years.

17

1    Q.   Ten or thereabouts?

2    A.   Approximately.

3    Q.   And I don't mean --

4    A.   Yes, sir.

5    Q.   -- to pin you down to a specific

6    number.

7    A.   Yes, sir.

8    Q.   What did you understand Mr. Smith's

9    duties to be as a foreman for Boan?

10   A.   He made sure they had everything

11   they needed to complete the job.  He made sure

12   that his crew members were where they were

13   supposed to be and doing what they were

14   supposed to be doing sometimes 24/7 during the

15   job.

16   Q.   Did he work as a foreman only with

17   jobs away from the company's office or

18   headquarters?

19   A.   Yeah.  He -- They're always away

20   from the company office.  Unless they were

21   picking up supplies, they were not working at

22   the office.

23   Q.   As a foreman working on these jobs,

18

```
 1    did that require him to be gone for extended

 2    periods frequently?

 3         A.   Yes, sir.

 4         Q.   You mentioned the truck that -- the

 5    Boan company owned truck that was assigned to

 6    your husband.

 7         A.   Yes, sir.

 8         Q.   It was typically this -- It was

 9    always the same truck --

10         A.   Yes, sir.

11         Q.   -- that he drove?

12         A.   Um-hum (yes).

13         Q.   What kind of truck was that?

14         A.   I don't know that I remember.  A

15    Chevrolet, I believe.  I know it was a white

16    Chevrolet.  It had the big body on the back

17    with all the tools.

18         Q.   Was it a pickup truck?

19         A.   Yes.  It had the big tool boxes all

20    the way around the side, because he had to

21    carry a lot of tools and he was in charge of

22    those also.

23         Q.   Did Mr. Smith typically drive that
```

19

1    truck to the job sites?

2         A.   Yes.

3         Q.   Where did the truck stay when he

4    didn't have it at the job site?

5         A.   At our home.  He didn't turn it in

6    on the weekends or anything.

7         Q.   And I understand that the work

8    schedule on these jobs could be fairly

9    irregular; is that right?

10        A.   Yes, sir.

11        Q.   So it could easily be true that he

12   wasn't home every weekend.

13        A.   Yes, sir.

14        Q.   But whenever he was home, he parked

15   the truck at your house?

16        A.   Yes, sir.

17        Q.   Did he drive it any around, you

18   know, town on the weekends or on the days that

19   he was home?

20        A.   Not much.  Occasionally he would.

21   He would have it washed and cleaned and oil

22   changed and tires if he needed to do that.

23   They had like a tab at the Andalusia Tire, and

20

```
 1   he would make sure it was taken care of.

 2        Q.   And that was sort of maintenance

 3   that was paid for by the company?

 4        A.   Yes, sir.

 5        Q.   How about gas?  How was that paid

 6   for?

 7        A.   By the company.

 8        Q.   He had a gas card?

 9        A.   He had a card -- credit card.

10        Q.   Did you ever drive the Boan truck

11   when it was home for the weekends?

12        A.   I might have driven it to move it

13   to mow under it.

14        Q.   Understood.  But not around town

15   or --

16        A.   No, sir.

17        Q.   -- to school or anything like that?

18        A.   No, sir.

19        Q.   Prior to the week of his accident

20   -- and we'll talk about that in a little bit

21   -- had Mr. Smith ever driven his own personal

22   car or truck to a Boan job site that you're

23   aware of?
```

21

1          A.   On occasion.  If there was a

2    doctor's appointment or a special occasion.

3    Because all the tools was in his truck and he

4    normally picked up several people and carried

5    them also, they would have to have the truck

6    and the tools there on the job.  So it

7    happened occasionally.

8          Q.   You mean if there was a doctor's

9    appointment -- You said if there was a

10   doctor's appointment or special occasion.  Do

11   you mean if Mr. Smith himself had to go to a

12   doctor's appointment --

13         A.   Yes, sir.

14         Q.   -- and leave the job site?

15         A.   Yes, sir.

16         Q.   Okay.

17         A.   He would always show up later.

18   I've taken him to work with broken arms and a

19   broken leg and --

20         Q.   You mean he'd always show up to

21   work even if he had a doctor's appointment?

22         A.   Even if I had to take him.

23         Q.   In any of those instances when you

22

1    recall that he drove his own truck to the job

2    site for a reason such as you've described, do

3    you know if Boan reimbursed Mr. Smith for the

4    mileage or the gas that he used on those

5    trips?

6         A.    He would let him use the credit

7    card to put the gas in the truck.  Yes, sir.

8         Q.    Do you know if he was reimbursed

9    for mileage?

10        A.    He got an expense check every week

11   for being out of town, and so it didn't matter

12   where -- you know, if he was on his truck.

13   But as far as just specifically for his truck,

14   no, sir.

15        Q.    When you say "an expense check for

16   being out of town", was that like a per diem

17   for food and lodging?

18        A.    Yes, sir.  Well, for food.  They

19   paid for all his lodging.

20        Q.    Okay.  The company paid directly

21   for the hotels.

22        A.    Yes.  Yes.  That didn't come to us.

23   Roger got a salary and then he got a check for

23

```
 1   food.
 2        Q.   Okay.  It's my understanding, Ms.
 3   Smith, that immediately prior to his accident,
 4   Mr. Smith was working on a job for Boan in
 5   Jacksonville, Florida; is that right?
 6        A.   Yes, sir.
 7        Q.   What kind of job was that, do you
 8   know?
 9        A.   I honestly don't know.
10        Q.   How long had it been going on?
11        A.   A long time.
12        Q.   Five or six months sound about
13   right?
14        A.   Maybe longer than that.
15        Q.   Was that a longer than normal
16   period of time for a job to be going on that
17   Mr. Smith would be working on?
18        A.   Not necessarily longer than normal.
19   He was always gone.  And sometimes they would
20   be short jobs, and sometimes they would be
21   longer.
22        Q.   Sure.  But this doesn't stand out
23   as the longest one --
```

24

1          A.    As the longest one ever, no, sir.

2          Q.    -- that you can remember or

3    something like that?

4          A.    No, sir.

5          Q.    Prior to the week or the time

6    shortly before the accident, prior to that

7    trip, had Mr. Smith driven the Boan company

8    truck to Jacksonville?

9          A.    Yes, sir.

10         Q.    Had he ever driven his own truck to

11   Jacksonville before that week?

12         A.    Before that week, I really don't

13   remember.

14         Q.    Ms. Smith, when was the last time

15   that your husband was at home in Andalusia

16   before he went to Jacksonville for the last

17   time?

18         A.    I don't remember the exact date.

19   It was, I know, the first week in September.

20   We were -- But I don't know what day of the

21   week.  Possibly Thursday, because we were

22   going to Louisiana.  My daughter-in-law was

23   expecting twins.  And while we were there on

25

1    Saturday, he got a call saying that he needed

2    to come back to Jacksonville.  And so he left.

3    He and my daughter left, and then I stayed.

4    We had taken different vehicles, because we

5    knew that was a possibility.

6         Q.   Yes, ma'am.

7         A.   And so I stayed.  My mother and I

8    stayed.

9         Q.   And your recollection -- And I'm

10   not trying to get you specific on a day -- But

11   about a week before the accident was when you

12   all left Andalusia to go down to Louisiana?

13        A.   Approximately a week, yes, sir.

14        Q.   Okay.  Where in Louisiana did you

15   go?

16        A.   Shreveport.  Barksdale.

17        Q.   Is that where your --

18        A.   He was stationed.

19        Q.   He's in the Air Force?

20        A.   Yes, sir.

21        Q.   And you said that a phone call came

22   in while you were in Louisiana --

23        A.   Um-hum (yes).

26

```
 1        Q.    -- on Saturday?

 2        A.    Um-hum (yes).

 3        Q.    Do you know who made the phone

 4   call?

 5        A.    I don't.

 6        Q.    Did you talk to anybody from --

 7   This was a phone call from Boan Contracting as

 8   you understand; right?

 9        A.    As I understand it, yes, sir.  I

10   didn't talk to them.

11        Q.    You didn't talk to anybody on the

12   phone?

13        A.    Hu-huh (no).

14        Q.    What do you recall Mr. Smith

15   saying, if anything, had happened?

16        A.    He just -- He had to go back and

17   call him every day and let him know what was

18   going on.  And Barry had also told him, you

19   know, that we'll fly you back to Louisiana if

20   those twins start being born.  So I mean --

21        Q.    And by "Barry", you mean Barry

22   Boan?

23        A.    Barry Boan.  Yeah.  All the Boans
```

27

```
 1    were always really good to us.
 2          Q.   Was Barry Mr. Smith's boss or
 3    supervisor --
 4          A.   On this job.
 5          Q.   -- on this job?
 6          A.   Um-hum (yes).
 7          Q.   So your grandchildren hadn't been
 8    born yet when this call came in?
 9          A.   Hu-huh (no).
10          Q.   I'm sorry.  Can you answer out
11    loud, if you can, for the court reporter?
12          A.   I'm sorry.  No, sir.  They had not
13    been born.
14          Q.   And you said he left Louisiana with
15    your daughter?
16          A.   Um-hum (yes).
17          Q.   Where was he taking her?
18          A.   She was coming back to Andalusia,
19    and then he left from Andalusia going to
20    Jacksonville.
21          Q.   Do you know when he arrived in
22    Jacksonville?
23          A.   I really don't.  I know it was
```

28

1    either late Saturday or early Sunday morning.

2    Because he left after they got home.   And I

3    don't remember if he spent the night at home

4    that Saturday night and left Sunday morning or

5    not.   No.   He left Saturday.   He left

6    Saturday, because he came by to see Kelly.

7    She had gotten a hair appointment and got her

8    hair done, and he came by and told her I'm

9    going.

10         Q.   And you're talking about that all

11   happened here in Andalusia?

12         A.   On Saturday here in Andalusia.

13   Yeah.

14         Q.   Okay.   Did you talk with Mr. Smith

15   after he got to Jacksonville --

16         A.   Yes, sir.

17         Q.   -- to know that he had arrived?

18         A.   Yes, sir.

19         Q.   So you know he got there sometime

20   by the end of that weekend.

21         A.   Yes, sir.

22         Q.   All right.   He was in his own

23   personal truck; is that right?

29

1     A.   Um-hum (yes).

2     Q.   What kind of truck was that?

3     A.   It was a black and red Chevrolet

4  pickup 1500.  It was just a regular cab truck.

5     Q.   At any time after he left Louisiana

6  to go back, did he ever tell you the nature of

7  the reason why he had been called back to

8  Jacksonville?

9     A.   No, sir.  If he did -- My mind was

10  on the twins.  And he would talk about his

11  jobs to me, but I didn't really understand

12  what was going on, so I would listen.

13     Q.   That's what I do with my wife when

14  she talks to me about her job.

15     A.   Well, that's what Roger did to me

16  when I talked about my students too; my first

17  graders.  So --

18     Q.   So he may have told you, but today

19  with the time that's passed, you don't

20  remember; is that right?

21     A.   No, sir.  I don't remember.  No,

22  sir.  I just remember they were working long

23  hours.

30

1      Q.   Yes, ma'am.  Do you know where Mr.

2  Smith's Boan company truck was at that time?

3      A.   It was at the job in Jacksonville.

4      Q.   And how had it gotten there, if you

5  know?

6      A.   I believe as well as I can recall

7  that because the tools had to be down there

8  and some of the other men who lived around the

9  area was also going to Jacksonville that

10  usually rode with Roger, they came by and got

11  the truck and took it down.

12      Q.   And do you know when that happened?

13      A.   I don't.

14      Q.   We talked to Mr. Doug Boutwell

15  earlier today --

16      A.   Yes, sir.

17      Q.   -- who I understand worked with Mr.

18  Smith.

19      A.   Yes, sir.

20      Q.   And do you know when Mr. Boutwell

21  or the rest of the crew went back to

22  Jacksonville that week?

23      A.   I really don't.  I'm not even sure

31

1   if they all came home for the weekend.   Roger

2   might have caught a ride with a big truck or

3   -- I really don't remember how he got home.   I

4   think his truck was in Jacksonville the whole

5   time.

6       Q.   Okay.  So you're not sure then at

7   this point whether the crew -- the Boan crew

8   was -- had ever left Jacksonville.

9       A.   I think they were -- I believe --

10  Because if they hadn't been, he would have

11  been on his truck, and it would have been home

12  on Saturday if they had all left.   And it

13  wasn't.   It's just one of those circumstances.

14      Q.   Do you have any recollection or did

15  you ever hear that there was any sort of

16  mechanical problem with Mr. Smith's Boan

17  company truck around that time that kept it

18  from being driven?

19      A.   No, sir.  Not that I'm aware of.

20      Q.   Do you recall if you ever talked

21  with Mr. Smith about any possibility that he

22  would take the Boan company truck to Louisiana

23  on that trip?

32

```
 1        A.   No.  He would not have done that.

 2        Q.   We know he didn't, of course.

 3        A.   He wouldn't have.

 4        Q.   Didn't even talk about it with you.

 5        A.   No.  He didn't use the company

 6   truck for his own truck.

 7        Q.   I want to ask you a few questions.

 8   Well, that's not true.  I don't want to.  But

 9   I need to ask you a few questions about the

10   day of the accident, ma'am.

11        A.   Yes, sir.

12        Q.   That was on September 8th of 2005;

13   is that right?

14        A.   Yes, sir.

15        Q.   Do you know when Mr. Smith left

16   Jacksonville that day --

17        A.   I don't.

18        Q.   -- roughly?

19        A.   No, sir.  I didn't know he was

20   coming home that day.

21        Q.   I'm sorry?

22        A.   I did not know he was headed home

23   that day.
```

33

1      Q.   You did not know he was headed home

2    that day?

3      A.   I did not know.

4      Q.   Did you have a day when you

5    expected him to come home?

6      A.   Friday.

7      Q.   On Friday?

8      A.   Yes, sir.

9      Q.   Do you know now why he came home on

10   Thursday instead of Friday?

11     A.   No, sir.

12     Q.   Do you know whether or not the rest

13   of the Boan crew left Jacksonville on

14   Thursday?

15     A.   I don't.  I know that we were

16   planning to go back to Louisiana, because at

17   this point, you know, the doctors were saying,

18   well, we are gonna let the twins be born.  My

19   daughter-in-law had been in the hospital for

20   weeks and weeks.

21     Q.   When were the twins born?

22     A.   The 14th.

23     Q.   Was everything all right?

34

1          A.   Yes, sir

2          Q.   But you hadn't talked to Mr. Smith

3     and said come home early so we can go to

4     Louisiana or anything of that nature, I take

5     it.

6          A.   Hu-huh (no).

7          Q.   Is that a no?

8          A.   No, sir.  Sorry.

9          Q.   I take it then that you didn't talk

10    with Mr. Smith that day at all or you would

11    have known he was coming home; is that right?

12         A.   Yes, sir.  I did not talk to him

13    that day.

14         Q.   So do you know if he had any other

15    stops to make on his trip that day other than

16    coming home?

17         A.   He was just coming home.

18         Q.   Now, the site where the accident

19    took place, do you know if that was his -- on

20    his normal route from Jacksonville to home?

21         A.   Yes, sir, it was.

22         Q.   Do you have any idea what happened

23    to the Boan company truck that had been his

35

```
1   that week --

2        A.   No, sir.

3        Q.   -- if it ever got back from

4   Jacksonville or anything of that nature?

5        A.   No, sir.

6        Q.   Okay.  Ms. Smith, did you file the

7   workers compensation claim arising out of this

8   accident with your husband's employer?  Do you

9   recall?

10       A.   I don't recall.

11       Q.   Do you recall or do you know if

12  you've received any sort of workers

13  compensation payment or series of payments as

14  a result of that accident?

15       A.   Yes, sir.  I do know.

16       Q.   And did you have an attorney help

17  you with that; with a claim for those workers

18  compensation benefits that you remember?

19       A.   Not that I remember.  Can I ask

20  you?  You didn't help me with them?

21            MR. SLEDGE:  Just a little bit.

22       A.   Oh, okay.

23       Q.   I'm not trying to --
```

36

1        A.    That's okay.

2        Q.    -- trick you or fool you or

3    anything.

4        A.    No.  I don't believe you are.  But

5    I -- You know, there's just some things

6    that --

7        Q.    Sure.  I understand, ma'am.

8        A.    -- I don't remember.

9        Q.    That's all right.  Are you

10   receiving periodic payments for the workers

11   comp claim?

12       A.    Yes, sir.

13       Q.    And how much are you receiving on

14   it every -- is it month?

15       A.    Every week.

16       Q.    Every week?

17       A.    Five hundred dollars.

18       Q.    Do you know how long those payments

19   are scheduled to continue?

20       A.    No, sir.

21       Q.    Do you know if either Boan

22   Contracting or Boan Contracting's workers

23   compensation insurance company ever contested

37

1    or disputed a claim for benefits for Mr.

2    Smith?

3         A.   I'm not aware that they did.

4         Q.   Did Mr. Smith carry personal

5    automobile insurance at the time of his

6    accident?

7         A.   Yes, sir.

8         Q.   All right.  Was any claim for

9    uninsured motorist benefits made under that

10   policy?

11        A.   We didn't have any uninsured

12   motorist insurance on the black and red truck

13   or my personal car.

14        Q.   I'm sorry.  Did you say on the

15   truck or your personal car?

16        A.   Or on my truck.

17        Q.   Okay.  So there was -- It's your

18   understanding there was no uninsured motorist

19   coverage on your personal automobile policy.

20        A.   On the ones that we drove, no, sir.

21        Q.   Okay.  And leaving aside the Zurich

22   policy that's at issue here.  I'm not talking

23   about that at all.

38

```
 1        A.    Right.   On my truck that I drove

 2   and the truck that he was on, we didn't have

 3   uninsured on them.

 4        Q.    Okay.   Did Mr. Boan have a life

 5   insurance policy in force at the time?

 6        A.    Boan Contracting on Roger?

 7        Q.    Did his company have one on Roger?

 8        A.    No, sir.

 9        Q.    Okay.   Did you or he have a

10   personal life insurance policy?

11        A.    Yes, sir.

12        Q.    Did those pay off?

13        A.    Yes, sir.

14        Q.    What was the benefit that was paid?

15        A.    A hundred and fifty thousand.

16        Q.    Was that one policy or more than

17   one?

18        A.    One policy.

19        Q.    And did you either on your own

20   behalf or on behalf of Mr. Smith's estate file

21   a claim against the other driver in the

22   accident?

23        A.    No, sir.   Yes.   I don't
```

39

1    personally --

2        Q.    Did you ever file a lawsuit

3    against, I think her name was, Carter?  The

4    driver in the other lawsuit -- I mean, the

5    accident, do you know if you ever filed a

6    lawsuit against that driver?

7        A.    I don't remember.

8        Q.    Did you receive --

9        A.    I'm not using the right words.

10       Q.    That's all right.

11       A.    I'm sorry.

12       Q.    If you don't understand the

13   question or not sure, then that's what I need

14   you to tell me.  And I appreciate it.

15       A.    Okay.

16       Q.    Have you received any money or has

17   the estate received any money from the other

18   driver or from somebody on her behalf?

19       A.    No, sir.

20       Q.    Do you know if the other driver had

21   any insurance -- any automobile insurance?

22       A.    I believe she did.

23       Q.    And how much?

40

```
 1        A.    A minimum amount.

 2        Q.    Do you have any idea of a figure?

 3        A.    I'm sorry.  I don't.

 4        Q.    Sure.  As you understand it now,

 5   you have not received any payment under that

 6   insurance policy from -- arising out of your

 7   husband's accident?

 8        A.    I haven't received any money.

 9              MR. SLEDGE:  Can we go off the

10   record?

11        Q.    Sure.

12

13        (Whereupon, an off-the-record discussion

14         was had.)

15

16        Q.    Ms. Smith, have you had any

17   communication, whether it's on the phone or

18   written, yourself with anyone from Zurich

19   about the claim for uninsured motorist

20   benefits that you've made?

21        A.    Not on the phone, no, sir.  The

22   only thing that I received was that subpoena.

23        Q.    Is that the notice for your
```

41

```
1    deposition here today you're talking about?
2              MR. SLEDGE:  I think she's talking
3    about the summons for the original complaint.
4         Q.   Oh, okay.
5         A.   The summons.  That's the only --
6         Q.   The summons for the complaint in
7    this declaratory judgement action that we're
8    here on today.
9         A.   Yes, sir.
10        Q.   Okay.  You haven't received any or
11   sent any letters or faxes or e-mails to Zurich
12   about this claim; is that right?
13        A.   No, sir, I haven't.
14        Q.   And you haven't received any from
15   them.
16        A.   No, sir, I haven't.
17        Q.   Okay.  How about with anyone with
18   Boan Contracting?  Have you spoken for written
19   with anyone with the company about the claim
20   that's been made for benefits under the
21   company's auto policy?
22        A.   No, sir.
23        Q.   If y'all will bear with me a
```

42

1    moment, we're probably about done.

2         The week when he took his own personal

3    truck to Jacksonville, do you have any

4    knowledge as to whether he used the company

5    gas card to buy gas on that trip?

6         A.    I don't have any knowledge.

7         Q.    And did the company reimburse him

8    or you for his use of that truck in any way

9    that you remember that week?

10        A.    No, sir.  And I don't have any

11   knowledge of it, but I do know that his credit

12   card and Barry would have wanted him to fill

13   up the truck as far as getting it to work and

14   back.

15        Q.    That's what you understand would

16   normally have been the procedure.

17        A.    Yes.  But I do not know that.  But

18   that would have been normal.

19        Q.    Sure.  I understand.  Thank you.

20   Those are all the questions I have, Ms. Smith.

21   I appreciate it very much.

22

23             FURTHER DEPONENT SAITH NOT

43

```
 1              C E R T I F I C A T E

 2

 3    STATE OF ALABAMA)

 4    COUNTY OF BUTLER)

 5

 6         I do hereby certify that the above and

 7    foregoing transcript of proceedings in the

 8    matter aforementioned was taken down by me in

 9    machine shorthand, and the questions and

10    answers thereto reduced to writing under my

11    personal supervision, and that the foregoing

12    represents a true and correct transcript of

13    the proceedings given by said witness upon

14    said hearing.

15

16         I further certify that I am neither of

17    counsel nor related to the parties to the

18    action, nor am I in any wise interested in the

19    result of said cause.

20

21                    --------------------

22                    Sue Anne Casey

23                    Court Reporter
```

# EXHIBIT 3

1

1    IN THE UNITED STATES DISTRICT COURT FOR

2        THE MIDDLE DISTRICT OF ALABAMA

3            NORTHERN DIVISION

4

5

6    CASE NUMBER:  2:07-CV-216-MEF

7

8    ZURICH AMERICAN INSURANCE COMPANY,

9            Plaintiff,

10           vs.

11   JUNIORETTE GRIFFIN SMITH, as Administratrix of

12   the Estate of Dale Smith, deceased,

13           Defendant.

14

15       *   *   *   *   *   *   *   *   *   *

16

17       The deposition of Doug Boutwell, taken

18   pursuant to Alabama Rules of Civil Procedure

19   before Sue Anne Casey, Court Reporter and

20   Notary Public, State at Large, at The Comfort

21   Inn, Saraland, Alabama on the 5th day of

22   March, 2008 commencing at approximately 9:00

23   a.m.

2

```
 1           S T I P U L A T I O N

 2

 3           IT IS STIPULATED by and between

 4   Counsel for the parties that this deposition

 5   be taken at this time by Sue Anne Casey, Court

 6   Reporter and Notary Public, State at Large,

 7   who is to act as commissioner without formal

 8   issuance of commission to her; that said

 9   deposition be taken down stenographically,

10   transcribed and certified by the commissioner.

11

12           Except for objections as to the form

13   of the questions, no objections need be made

14   at the time of the taking of the deposition by

15   either party, but objections may be interposed

16   by either party at the time the deposition is

17   read into evidence, which shall be ruled upon

18   by the Court on the trial of the cause upon

19   the grounds of objection, then and there

20   assigned.

21

22           The reading and signing of the

23   deposition is waived.
```

3

```
 1                    A P P E A R A N C E S

 2

 3

 4

 5     PLAINTIFF:

 6     By J. David Moore

 7     WALSTON, WELLS & BIRCHALL, LLP

 8     1819 Fifth Avenue North

 9     Suite 1100

10     Birmingham, AL  35203

11

12

13

14

15     DEFENDANT:

16     By Christopher M. Sledge

17     WOODARD, PATEL & SLEDGE

18     1213 East Three Notch Street

19     Andalusia, AL  36420

20

21

22

23
```

4

```
1                    I N D E X

2

3

4

5   EXAMINATION BY:                    PAGE NO:

6   Mr. Sledge                         5, 31

7   Mr. Moore                          23, 36

8

9

10

11

12          *   *   *   *   *   *   *   *   *

13

14

15

16

17              E X H I B I T S

18

19

20      (Whereupon, no exhibits were marked.)

21

22

23
```

5

```
 1              DOUG BOUTWELL

 2      being first duly sworn, was examined

 3           and testified as follows:

 4

 5

 6              THE REPORTER:  Usual stipulations?

 7              MR. MOORE:  That's fine.

 8

 9    EXAMINATION BY MR. SLEDGE:

10        Q.   Could you please state your full

11    name?

12        A.   Douglas Winton Boutwell.

13        Q.   Mr. Boutwell, have you ever done a

14    deposition before?

15        A.   No, sir.

16        Q.   All right.  Let me give you a

17    little bit of what's going on.  I'm gonna ask

18    you some questions under oath.  If I ask you

19    anything that you don't understand, just tell

20    me, and I'll try to rephrase it for you.  If

21    you need a break, just tell me, and we'll take

22    a break.  Again, if there's any questions that

23    ask you that you don't understand, just tell
```

6

1     me and I'll rephrase it and we'll try to go

2     back over it and see if I can straighten it

3     out for you.

4          A.    Okay.

5          Q.    Have you got a nickname or anything

6     that you go by?

7          A.    They just call me Doug.

8          Q.    And what's your date of birth?

9          A.    3/7/75.

10          Q.    Okay.  And where are you employed?

11          A.    Boan Contracting.

12          Q.    And how long have you been employed

13     with Boan?

14          A.    Since 2000.

15          Q.    And what are your duties?

16          A.    Operator.

17          Q.    And what does that do as an

18     operator?

19          A.    Just a trackhoe operator --

20     equipment operator.

21          Q.    Have you been an operator since

22     2000?

23          A.    Yes, sir.

7

```
1          Q.    And where do you work out of?

2          A.    Greenville.

3          Q.    I understand Boan has got a couple

4    of offices in different places.

5          A.    Sure.

6          Q.    But you work out of the Greenville

7    office mostly?

8          A.    Yes, sir.

9          Q.    Do you work in different locations

10   throughout the state or --

11         A.    Yeah.  We work mostly in Alabama,

12   but we do do some work in Mississippi.

13         Q.    What exactly does Boan do?

14         A.    Pipeline.

15         Q.    Gas pipeline or --

16         A.    Do some of all of it, but mostly

17   gas.

18         Q.    Okay.  Let me ask you do you know

19   -- Did you know Roger Smith?

20         A.    Yes, sir.

21         Q.    Okay.  And how did you know Roger?

22         A.    He was my foreman.

23         Q.    Okay.  How long was he your
```

8

1    foreman?

2        A.    Well, it was in and out at times

3    he was my foreman.  At times, I had other

4    foremen.  As an operator, we moved around, you

5    know, from foreman to foreman.

6        Q.    I guess a foreman would be

7    responsible for -- Tell me exactly what a

8    foreman would do.

9        A.    He's the one that answers to the

10   one -- The guy we work for.  He's the one that

11   tells us what to do every day.

12       Q.    Okay.  So did each foreman have its

13   own crew?

14       A.    Yes, sir.  Some is in and out, you

15   know, just -- You know, if somebody is out,

16   you know, we may go work for somebody else,

17   you know.

18       Q.    Okay.  How many --

19       A.    We're not assigned an exact

20   foreman.

21       Q.    How many foremen -- Excuse me.  How

22   many crew members did Roger have that worked

23   with you?

9

```
 1        A.   It varies.

 2        Q.   Do you recall exactly how long you

 3   worked with Roger?

 4        A.   Well, I worked with him since 2000,

 5   you know --

 6        Q.   Okay.

 7        A.   -- to 2005, which was his death.

 8        Q.   So you were working with him back

 9   on September 8, 2005?

10        A.   Yes, sir.

11        Q.   Okay.  Do you recall where y'all

12   were working at?

13        A.   Jacksonville.

14        Q.   And what were y'all doing in

15   Jacksonville?

16        A.   Laying a waste waterline.

17        Q.   And how long had y'all been in

18   Jacksonville?

19        A.   Approximately five to six months.

20        Q.   Okay.  Were y'all staying down

21   there or did you drive back and forth every

22   day?

23        A.   We stayed.
```

10

1    Q.   When would you go down to begin the

2    week?

3    A.   Primary mostly on Sundays.  You

4    know, we leave Sunday afternoon and be at work

5    on Monday morning.

6    Q.   Okay.  And how long would y'all

7    stay?

8    A.   It just depended on the rain, you

9    know, if it was raining.  Sometimes two weeks.

10    Q.   So you would stay two weeks at a

11    time and then come back home?

12    A.   Yes, sir.  And the weather, you

13    know, permitting.  Sometimes the weather

14    changed.

15    Q.   Sure.  Where were you living back

16    in 2005?

17    A.   Flomaton.

18    Q.   Do you know where Roger lived?

19    A.   Andalusia.

20    Q.   How were y'all getting down to

21    Jacksonville during that period?

22    A.   Me and him rode together.

23    Q.   And whose vehicle did you take?

11

1        A.    The company truck.

2        Q.    Who was responsible for that

3    company truck?

4        A.    Well, we both had a truck.  And

5    sometimes we drove his, and sometimes we drove

6    mine.  But, you know, we usually rode

7    together.

8        Q.    Now, it's a company truck that is

9    provided by Boan?

10       A.    Yes.

11       Q.    What kind of truck was it?

12       A.    His was a 250 HD Chevrolet.  Mine

13   was a 450 Ford.

14       Q.    Okay.  So back in 2005, each one of

15   y'all had your own company truck?

16       A.    Yes.

17       Q.    Do all employees of Boan have their

18   own company truck?

19       A.    No, sir.

20       Q.    Which employees have them?

21       A.    Well, he just assigned some trucks

22   -- All foremen have got them and some

23   operators.

12

1      Q.   And you are one of the operators

2    that had one.

3      A.   I was one of the operators that had

4    a truck.

5      Q.   And you're for certain you had your

6    own personal truck back in 2005?

7      A.   Yeah.  I had mine.

8      Q.   Your own company truck.  Excuse me.

9      A.   Yeah.

10      Q.   So you would only take one company

11    truck down to Jacksonville.  You would either

12    ride with Roger or Roger would ride with you?

13      A.   Yes.  Well, we carried -- Initially

14    we carried both of them and the, you know, as

15    the job went on, we drove just one back and

16    left one on the security yard down there.  Our

17    yard was, you know, security, and we only

18    drove one home.  I would ride with him home or

19    he would ride with me home.

20      Q.   But I understand that no matter

21    what, when you were on the job, you both had

22    your company trucks down there.

23      A.   Yes, sir.

13

1         Q.   Okay.  But you would just drive one

2    back and forth and leave the other one down

3    there.

4         A.   Yes, sir.

5         Q.   Now, I want to take you back to

6    September 8, 2005.  And that's the day Roger

7    was killed in the car accident.

8         Roger was on his personal vehicle.  Do

9    you know the circumstances surrounding Roger

10   being on his personal vehicle?

11        A.   Yes, sir.

12        Q.   Okay.  If you don't mind, just kind

13   of explain that.

14        A.   He was on his personal truck.  He

15   drove it down the week before when we went

16   back because his son was gonna have babies --

17   have a youngin.  So he drove his truck so if

18   she had it -- you know, the babies, he could

19   come home.

20        Q.   Do you understand that he was on

21   some kind of vacation -- I guess, he was

22   taking vacation time at that period?

23        A.   He was going to, you know.  When

14

1    she had the babies, he was gonna take vacation

2    time.

3        Q.   Okay.  Is it your understanding

4    that he was in Louisiana?

5        A.   I was thinking -- I told -- I

6    thought he was in Texas.  It might have been

7    Louisiana.  I was under the impression he was

8    in Texas, you know, with his son.  He was in

9    the Air Force, and he moved, you know.  But I

10   thought he was in Texas.

11       Q.   Okay.  Why did he take his personal

12   vehicle down to Jacksonville?

13       A.   So he could come home.  His, you

14   know, company truck has got tools that we use,

15   and he didn't really know how many days he was

16   gonna be off.  So he drove his personal truck

17   so, you know, we'd have tools.

18       Q.   Okay.  Let me just back up a little

19   bit.  Before September 8th and before he went

20   to Louisiana with his -- waiting for his

21   grandchild to be born, how did he get back to

22   his home?  Did he take his -- Did he ride with

23   you back?

15

1      A.    Yeah.  I would come by, you know,

2  and drop him off, and then, you know, I would

3  go on home.  I live an hour, you know, south.

4      Q.    Prior to the accident, when did he

5  come back to Jacksonville?  Do you recall?

6      A.    It was probably the week before.

7  We come back on that Sunday afternoon.  He did

8  and I did too.  And we'd work a week.  We was

9  working on our second week when we come home.

10  That was on a Thursday.

11      Q.    Okay.  Let me ask you if you recall

12  it this way.  Do you recall him being in

13  Louisiana and Boan Contracting contacting him

14  and say, hey, we need you in Jacksonville now,

15  that there's some kind of emergency or

16  something along those lines?  Do you remember

17  anything to that affect?

18      A.    No.  He hadn't went yet.  You know,

19  at that time, he was, you know, just waiting.

20  You know, he didn't want to take his time

21  before she had the babies, because he wanted

22  to be with his son, you know, after they had

23  the babies.

16

```
1        Q.   Okay.  You say this accident -- I
2   think the accident happened on a Thursday
3   night.  Do you recall when he came to work
4   that week prior?
5        A.   Not exact day.
6        Q.   Could it have been Saturday?
7        A.   I'm really uncertain, it's been so
8   long now, you know, when he come back, you
9   know, or me either.
10       Q.   Does Boan keep up with your time
11  when you're working and when you're not
12  working?
13       A.   Well, yeah.  I mean, they've got --
14       Q.   Records for that?
15       A.   I would assume they do.  They know
16  when they've got payroll.
17       Q.   So there's possibly some records
18  showing which day y'all actually went to work
19  that week?
20       A.   I mean, it's been two and a half
21  years.  I mean, at the time they would have.
22  I don't know how long they keep the records.
23  Yeah.  They would have when I worked and when
```

17

1  he worked too.

2      Q.   Would it be unusual for Boan to

3  call y'all in early to go and work on some

4  emergency situations, say, you had a gas line

5  leak or something like that and call you in on

6  a Friday night or Saturday?

7      A.   Well, hardly ever.  But he can, you

8  know.

9      Q.   Okay.  Do you recall whether

10  Roger's truck was ever in the shop during that

11  week --

12      A.   No, sir.

13      Q.   -- getting repairs done to it?

14      A.   No, sir.

15          MR. MOORE:  Which truck are you

16  talking about?

17      Q.   I'm sorry.  His company truck.

18      A.   No, sir.

19      Q.   No extra equipment added to it or

20  anything?

21      A.   No, sir.

22      Q.   How often did Roger drive his own

23  personal vehicle back and forth to work?

18

1      A.    That was the only time he had

2   driven it.

3      Q.    The only time that --

4      A.    During that project.

5      Q.    Yes, sir.

6      A.    He worked with Boan before I

7   started, so, you know, I'm really unsure about

8   that.  But that particular job, that was the

9   first time.

10     Q.    During the time that you worked

11  with Boan, do you ever recall Roger driving

12  his own personal vehicle?

13     A.    No, sir.

14     Q.    On September 8th, were you heading

15  back home also?

16     A.    Yes, sir.

17     Q.    Did you go in a different

18  direction?

19     A.    Yeah.  I go on -- I live further

20  down.  I went on down 10 and turned off 10 and

21  I kept going.

22     Q.    Let me ask you -- And we've already

23  talked about Boan providing vehicles --

19

1    company vehicles.  When you travel to and from

2    work, are you considered on the clock

3    basically?

4              MR. MOORE:  Object to the form.

5    You can go ahead and answer, if you know.

6         A.   No.  We ain't on the clock until we

7    get to work.

8         Q.   You're not on the clock until you

9    get to work.

10        A.   (Witness nods head yes.)

11        Q.   Did they provide you gas in the

12   company truck?

13        A.   Yes, sir.  We've got gas cards.

14        Q.   As far as you can remember, there

15   was no emergency or anything along those lines

16   a week prior at work?

17        A.   Not on our project.

18        Q.   Do you remember when Hurricane

19   Katrina came through?

20        A.   I don't remember the date, but yes,

21   I remember it.

22        Q.   Was it before or after Roger's

23   accident?

20

```
1        A.    It was before.  I'm not quite sure.
2   We had two or three tropical storms that year,
3   but I think that one was actually before.
4        Q.    Did Katrina affect your work in
5   Jacksonville?
6        A.    Yeah.  We was off some.  I don't
7   remember any of the days or how many days.  We
8   was off several days on account of rain.
9        Q.    Did that put y'all behind or
10  anything?  Anything that you can recall?
11       A.    No.  I don't recall.
12       Q.    Was Roger's truck at the work site
13  the day of the accident?   I'm sorry.  Roger's
14  company truck --
15       A.    Yes, sir, it was.
16       Q.    -- was left at the work site in
17  Jacksonville.
18       Other than him having his personal
19  vehicle down in Jacksonville, was there any
20  other reason why he didn't take the work truck
21  back to Andalusia?
22       A.    Well, as a foreman, he has our
23  equipment we use and tools.  And, you know, I
```

21

1   assume he elected to drive his so we would

2   have equipment to work with.

3       Q.   So tell me a little bit more about

4   that.  What tools does he have on his truck

5   that aren't on, say, your truck.

6       A.   Well, there would just be wrenches

7   and sockets and shovels and just a lot of

8   miscellaneous stuff.

9       Q.   So there's equipment on his truck

10   that y'all would need for day-to-day work.

11       A.   Yeah.  Day-to-day work.

12       Q.   So if he was going on vacation,

13   it's required that his truck be at the work

14   site at all times.

15       A.   Yes, sir.

16       Q.   Does Boan require that if you go on

17   vacation that you leave your particular work

18   truck at the site or what's their policy

19   concerning that?

20       A.   I never asked.  Unsure.

21       Q.   But on this particular occasion or

22   at least before September 8th, you know

23   definitely that Roger left his truck at the

22

```
 1    site because there was tools that were

 2    required for the job?

 3         A.    Yes.  He was going on a -- you

 4    know, gonna take vacation days.  So --

 5         Q.    Do you know how long Roger worked

 6    for Boan?

 7         A.    Not sure.

 8         Q.    But he was a foreman the entire

 9    time that you worked with them?

10         A.    Yes.

11         Q.    Who was Roger's boss?

12         A.    It would be Barry Boan or -- Boan

13    Contracting.  It's two or three of the owners.

14         Q.    David Scott, what is his position

15    with Boan?

16         A.    All I know is he works in the

17    office.  You know, I don't know, you know,

18    just what all he handles, but office, you

19    know.

20         Q.    That's it.  Thank you, sir.

21               MR. MOORE:  I may have one or two

22    questions, Mr. Boutwell.  Why don't we take

23    just a quick break.
```

23

```
1              (Whereupon, a break was taken.)

2

3    EXAMINATION BY MR. MOORE:

4         Q.   Mr. Boutwell, I'm David Moore, and

5    we've met before.  I represent Zurich

6    Insurance in this matter.  I just have a few

7    questions for you.  I hope we won't take up

8    too much more of your time.  I wanted to ask

9    you a little bit more about when you and Mr.

10   Smith returned from Alabama to the

11   Jacksonville job site prior to the accident on

12   September 8th of -- Was it 2005?

13        A.   Yes, sir.

14        Q.   We know that Mr. Smith drove his

15   personal truck.  You've talked about that; is

16   that right?

17        A.   Yes, sir.

18        Q.   Which truck did you drive back to

19   Jacksonville before the accident?

20        A.   I drove his truck -- his work

21   truck.

22        Q.   His company truck?

23        A.   We had drove his home that
```

24

1    particular week.

2        Q.    Where was your company truck?

3        A.    It was on the job site.

4        Q.    In Florida.

5        A.    In Jacksonville.

6        Q.    So when you were asked earlier

7    about whether there was any -- whether Mr.

8    Smith's company truck was in the shop or

9    anything like that -- And I may be misstating

10   exactly how that question was phrased -- you

11   know that it was in working order because you

12   had driven it to Florida just a few days

13   before; right?

14       A.    Yes, sir.

15       Q.    Turning to the reasons why Mr.

16   Smith drove his personal truck that week

17   instead of a company truck, tell me again what

18   you understood about his grandchildren being

19   born or about to be born.  How did you know

20   that that was the case?

21       A.    Well, me and him talked, you know.

22       Q.    You and Mr. Smith?

23       A.    Yes, sir.  Me and Mr. Smith talked.

25

1    And as a friend and as a bossman, you know, he

2    let us know where he would be and what he was

3    gonna do, you know.

4         Q.   Did he ever in fact go to -- Do you

5    know if it was Texas or Louisiana where these

6    grandchildren were coming?

7         A.   I'm really unsure.  I thought they

8    was in Texas.  It's been so long now, I'm

9    really unsure.

10        Q.   It might have been Louisiana, might

11   have been Texas?

12        A.   Sure.

13        Q.   You know it wasn't Alabama though.

14        A.   No.  It wasn't Alabama.

15        Q.   To your knowledge, did Mr. Smith

16   ever go to Texas or Louisiana, whichever it

17   was, to see his son and daughter-in-law prior

18   to --

19        A.   Yeah.  He had been to see them

20   prior.  I don't know, you know, the weeks or,

21   you know, days.  But he had been prior to the

22   accident.

23        Q.   Did you and Mr. Smith drive

26

```
 1    together to Jacksonville the week before the

 2    accident?

 3          A.   I mean, he was in his truck, and I

 4    was in mine.

 5          Q.   Right.  No.  That's a good point.

 6    Thank you.

 7          As I understand it, you and he

 8    essentially followed each other home from

 9    Jacksonville to Alabama on the day of the

10    accident in different trucks; right?

11          A.   Yes, sir.

12          Q.   Did you do that same thing going to

13    Jacksonville prior to the accident?

14          A.   No.  We wasn't together.

15          Q.   Do you know where he drove to

16    Jacksonville from?

17          A.   From his home.

18          Q.   Okay.  And how do you know that?

19          A.   Because I mean, we talked.  We

20    talked on the radio all the way.  We just

21    wasn't together.

22          Q.   Okay.  So he told you on the way to

23    Jacksonville over your phone or your radio
```

27

1    when you talked with him.

2          A.    (Witness nods head yes.)

3          Q.    Now, you talked about Mr. Smith

4    taking vacation in connection with his

5    grandkids coming.  Did Mr. Smith ever actually

6    take vacation days that you know of in

7    connection with those grandkids?

8          A.    I'm really unsure.  He had been to

9    see them, but I don't know if he had taken

10   vacation days or --

11         Q.    Between the time that you and he

12   drove to Jacksonville the last time prior to

13   the accident and coming home from Jacksonville

14   on the day of the accident, did Mr. Smith

15   leave the job site to go see those grandkids?

16         A.    No, sir.  He didn't leave the job

17   site.

18         Q.    He was there the whole time?

19         A.    Yes, sir.

20         Q.    And was this about a week or two

21   weeks?

22         A.    I'm really -- It was either a week

23   or two weeks.  No longer.

28

Q.    Okay.  On September 8th when you
and he returned from Jacksonville, did the
whole Boan crew leave on that day?

A.    Yes, sir.

Q.    What was the reason for leaving the
project on that Thursday?

A.    We had, you know, had worked a few
days and it was some rain coming, so we
knocked off where we'd have some time off.

Q.    This wasn't vacation time though.

A.    No, sir.  It was just strictly, you
know, kind of like a weekend thing, you know.

Q.    And when were you scheduled to
return to Jacksonville?

A.    On Sunday.  You know, go to work
and Monday morning, so we would have went down
on Sunday.

Q.    Okay.  And was that for the whole
crew?

A.    Well, the time to go back, you
know --

Q.    It was starting on Monday morning.

A.    Yeah.  We had to be at work at 6:30

29

1    on Monday.  Go back whenever.

2         Q.    Okay.  Have you ever driven your

3    personal truck to a job site for Boan instead

4    of a company truck?

5         A.    Yes, sir.

6         Q.    When did you do that?

7         A.    When I was first hired, I drove my

8    personal truck.

9         Q.    When you drove your personal truck,

10   did Boan ever pay you mileage for using your

11   truck?

12        A.    No.  You know, I had driven it to

13   the job site, you know, before I was -- You

14   know, I was at work at 6:30.  I didn't drive

15   it after the 6:30.

16        Q.    You didn't drive it on the job.

17        A.    I just drove it to the job.

18        Q.    And Boan didn't pay you to do that?

19        A.    No, sir.

20        Q.    Do you know if Boan has any policy

21   that calls for it to pay mileage for its

22   employees who drive their personal vehicles?

23        A.    I'm not sure.

30

1       Q.   On the day of the accident, you and

2   Mr. Smith essentially followed one another

3   back from Florida; right?

4       A.   Yes, sir.

5       Q.   Did you talk with him on the radio

6   during that trip?

7       A.   Yes, sir.

8       Q.   Did he say anything to you that you

9   remember that day about where he was going?

10      A.   Well, he was going home.

11      Q.   Did he say anything about going

12  anywhere else before he got home?

13      A.   No, sir.

14      Q.   When did you learn that Mr. Smith

15  would be driving his own truck to Florida and

16  not riding with you that week?

17      A.   The day or day before -- day of,

18  you know, going back, we talked.

19      Q.   And he talked to you about that?

20      A.   Yes, sir.  He told me, you know, I

21  didn't have to come get him, that he was gonna

22  drive his personal truck.

23      Q.   And during that conversation, do

31

1    you recall if he said why he was gonna take

2    his personal truck?

3          A.    Yeah.  Because he could come home

4    if he needed to.

5          Q.    But in the end, he didn't need to.

6          A.    In the end, he didn't need to.

7          Q.    That's all I have, Mr. Boutwell.

8    Thank you.

9

10    EXAMINATION BY MR. SLEDGE:

11          Q.    I just have a couple of follow-up.

12    I think you told me earlier that you drove his

13    truck to Jacksonville.  I'm talking about

14    Roger's company truck.

15          A.    Yes, sir.

16          Q.    You drove his company truck to

17    Jacksonville.

18          A.    (Witness nods head yes.)

19          Q.    Where did you pick his truck up at?

20          A.    I had driven -- When we drive home

21    the week prior to that, we rode home together.

22    I dropped him off at his home, you know, and I

23    drove his truck on to my house.

32

```
 1              MR. MOORE:  His company truck.

 2       A.    His company truck.

 3       Q.    So let me make sure I understand.

 4  The week before, he dropped you off or you

 5  dropped him off and took his company truck,

 6  and you took it home with you for that

 7  weekend.

 8       A.    Yes, sir.

 9       Q.    Okay.  So we're talking about on a

10  Friday or Thursday or Friday.

11       A.    Um-hum (yes).

12       Q.    You left out going back to

13  Jacksonville that Sunday.

14       A.    Yes, sir.

15       Q.    You took his truck.

16       A.    Yes, sir.

17       Q.    Okay.  Roger didn't go with you at

18  that point.

19       A.    No, sir.

20       Q.    Was he off that entire week?  Do

21  you recall?

22       A.    Prior to going back?

23       Q.    Yes, sir.  Prior to him coming down
```

33

1     to Jacksonville on his personal truck.

2          A.     No.  We went back, you know -- I

3     mean, he just drove his personal truck, and I

4     drove his company truck back.

5          Q.     I guess my question is why didn't

6     he just meet up with you and ride down with

7     you like you've done every time before that.

8          A.     Because he wanted to come home if

9     need be.  If she had the babies, he was coming

10    home, you know.  And he didn't want to drive

11    his truck -- I mean, his company truck and,

12    you know, not have a ride home.

13         Q.     Ms. Smith kind of remembers this a

14    little different.  And I'm gonna explain to

15    you what she remembers and see if you dispute

16    any of this.

17         She claims and will testify later that

18    they were in Louisiana; her, Roger, and Kellye

19    Wayne.  Roger gets a phone call from Boan

20    saying, hey, you need to come back to work,

21    we've got some kind of emergency or something

22    like that.  And he leaves out Friday night

23    with Kellye Wayne, drives to Andalusia on his

34

1   personal truck, drops Kellye Wayne off, and

2   then turns around Saturday morning and heads

3   to Jacksonville.  And that's the reason why he

4   took his personal vehicle down was because he

5   gets this phone call from Boan.

6       Do you have any reason to dispute

7   something like that if they remember it that

8   way?

9       A.   I mean, I don't -- You know, I know

10  he was in -- you know, he had been to see them

11  and she didn't -- You know, they thought they

12  was gonna have the babies, so he had went out

13  there and she didn't have the babies.  So he

14  had come back to work until, you know, time,

15  you know, where he wouldn't be off so long.

16      Q.   Yes, sir.  And I know it's been

17  almost two years back.  Do you remember if he

18  came to work on a Saturday?

19      A.   I'm unsure.

20      Q.   Now, I think you testified earlier

21  that y'all usually stay down there for like a

22  two-week period.

23      A.   Yes, sir.

35

1      Q.   Were you doing that along about

2  September of 2005?  Were y'all staying down

3  for a two-week period?

4      A.   We didn't have a set schedule.  We

5  worked with the weather.

6      Q.   Okay.

7      A.   If it was a storm coming in, we'd

8  come home.  If it was good weather, we worked.

9      Q.   Okay.  So you think it would be

10  highly unusual if Boan called him and said,

11  hey, we need you to be down here in

12  Jacksonville?

13      A.   I mean, you know, as far as

14  emergency, probably no.  But, you know, just

15  to work, you know, we don't get off much.  You

16  know, we work.

17      Q.   Do you recall if the hurricane had

18  any affect on your work?

19      A.   At this time, I don't remember.

20      Q.   Yes, sir.  But you know that you

21  had Roger's truck at the job site.

22      A.   Yes, sir.

23      Q.   Roger's work truck at the job site.

36

1   I'll get it right.

2        A.   Yes.  His truck was at the job

3   site.

4        Q.   And he drove his truck down -- his

5   personal truck down to the work site.

6        A.   Yes, sir.

7        Q.   Okay.  Could it have been that you

8   were already at the work site when he came

9   down on his personal truck?

10       A.   At this point I'm, you know -- I

11  don't recall now.

12       Q.   Okay.

13       A.   Because I don't remember when he

14  was off.

15       Q.   Yes, sir.  And I understand

16  completely, because it's been several years

17  back.

18       Okay.  Thank you, sir.

19

20  EXAMINATION BY MR. MOORE:

21       Q.   Mr. Boutwell, do you remember any

22  emergency on the Jacksonville job site in the

23  week or so prior to Mr. Smith's accident?

37

1     A.    No emergencies.

2     Q.    And I thought I understood you

3  earlier to say that you recalled Mr. Smith

4  talking to you on the phone the day before or

5  the day that you went back to Jacksonville the

6  week before the accident and telling you about

7  his grandkids coming and that's why he was

8  gonna take his personal truck.  Do you recall?

9  Am I remembering what you said right?

10    A.    Yeah.  You know, it's been two

11 years, but yeah.

12    Q.    Sure.  Of course.  And we all

13 understand that it's been a long time.

14    A.    We talked on the phone that, you

15 know, that's why he was driving his personal

16 truck back.

17    Q.    But as you sit here now, you don't

18 recall him coming from Louisiana or Alabama to

19 deal with some emergency situation in the week

20 or so prior to his accident.

21    A.    I don't recall that.

22    Q.    That's it.

23          MR. SLEDGE:  Thank you, sir.

38

1          MR. MOORE:  Thank you very much.

2

3

4

5

6

7

8

9          FURTHER DEPONENT SAITH NOT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

39

```
 1              C E R T I F I C A T E

 2

 3   STATE OF ALABAMA)

 4   COUNTY OF BUTLER)

 5

 6        I do hereby certify that the above and

 7   foregoing transcript of proceedings in the

 8   matter aforementioned was taken down by me in

 9   machine shorthand, and the questions and

10   answers thereto reduced to writing under my

11   personal supervision, and that the foregoing

12   represents a true and correct transcript of

13   the proceedings given by said witness upon

14   said hearing.

15

16        I further certify that I am neither of

17   counsel nor related to the parties to the

18   action, nor am I in any wise interested in the

19   result of said cause.

20

21                   -------------------

22                   Sue Anne Casey

23                   Court Reporter
```

# EXHIBIT 4

1

1       IN THE UNITED STATES DISTRICT COURT FOR

2           THE MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4

5

6    CASE NUMBER:  2:07-CV-216-MEF

7

8    ZURICH AMERICAN INSURANCE COMPANY,

9           Plaintiff,

10          vs.

11   JUNIORETTE GRIFFIN SMITH, as Administratrix of

12   the Estate of Dale Smith, deceased,

13          Defendant.

14

15          *   *   *   *   *   *   *   *   *   *

16

17       The deposition of David Scott, taken

18   pursuant to Alabama Rules of Civil Procedure

19   before Sue Anne Casey, Court Reporter and

20   Notary Public, State at Large, at The Comfort

21   Inn, Saraland, Alabama on the 5th day of

22   March, 2008 commencing at approximately 9:40

23   a.m.

2

```
 1              S T I P U L A T I O N

 2

 3              IT IS STIPULATED by and between

 4    Counsel for the parties that this deposition

 5    be taken at this time by Sue Anne Casey, Court

 6    Reporter and Notary Public, State at Large,

 7    who is to act as commissioner without formal

 8    issuance of commission to her; that said

 9    deposition be taken down stenographically,

10    transcribed and certified by the commissioner.

11

12              Except for objections as to the form

13    of the questions, no objections need be made

14    at the time of the taking of the deposition by

15    either party, but objections may be interposed

16    by either party at the time the deposition is

17    read into evidence, which shall be ruled upon

18    by the Court on the trial of the cause upon

19    the grounds of objection, then and there

20    assigned.

21

22              The reading and signing of the

23    deposition is waived.
```

3

```
 1              A P P E A R A N C E S

 2

 3

 4

 5    PLAINTIFF:

 6    By J. David Moore

 7    WALSTON, WELLS & BIRCHALL, LLP

 8    1819 Fifth Avenue North

 9    Suite 1100

10    Birmingham, AL   35203

11

12

13

14

15    DEFENDANT:

16    By Christopher M. Sledge

17    WOODARD, PATEL & SLEDGE

18    1213 East Three Notch Street

19    Andalusia, AL   36420

20

21

22

23
```

4

```
 1                    I N D E X

 2

 3

 4

 5     EXAMINATION BY:              PAGE NO:

 6     Mr. Sledge                    5, 39

 7     Mr. Moore                    28, 45

 8

 9

10

11

12          *   *   *   *   *   *   *   *   *

13

14

15

16

17               E X H I B I T S

18

19

20       (Whereupon, no exhibits were marked.)

21

22

23
```

5

```
 1                    DAVID SCOTT
 2        being first duly sworn, was examined
 3             and testified as follows:
 4
 5
 6   EXAMINATION BY MR. SLEDGE:
 7        Q.   Could you please state your full
 8   name?
 9        A.   David Gill Scott.
10        Q.   What was that middle name?
11        A.   Gill, G-I-L-L.
12        Q.   Okay.  Have you ever done a
13   deposition before?
14        A.   No.
15        Q.   I'm gonna ask you some questions
16   under oath.  And if there's anything you don't
17   understand, just tell me, and I'll try to
18   rephrase it and try to get the question a
19   little better to understand.
20        A.   Okay.
21        Q.   If you need a break, tell me, and
22   we'll take a break at any point in time.
23             Where are you employed?
```

6

```
 1        A.    Boan Contracting Company,

 2   Incorporated.

 3        Q.    Okay.  And how long have you been

 4   in an employee of Boan?

 5        A.    Since January of 1997.

 6        Q.    And what are your duties with Boan?

 7        A.    I'm the controller.

 8        Q.    And what exactly is a controller?

 9        A.    General accounting oversight and

10   then various duties assigned by the ownership.

11        Q.    Have you been a controller ever

12   since 1997?

13        A.    Yes.

14        Q.    Okay.  And where do you work out

15   of?

16        A.    Greenville, Alabama.

17        Q.    Have you worked out of Greenville

18   since '97?

19        A.    Yes.

20        Q.    Any other places you might have

21   worked out of?

22        A.    We have an office in Fairhope,

23   Alabama.
```

7

```
1        Q.    What exactly does Boan do?

2        A.    We're a utility pipeline

3   contractor.  We specialize in the installation

4   of water, natural gas, crude oil and sewer

5   pipelines.

6        Q.    Okay.  Does Boan work throughout

7   the State of Alabama?

8        A.    We do.  We also work in other

9   southeastern states specifically Florida and

10  Mississippi.

11       Q.    And how many employees does Boan

12  have?

13       A.    It fluctuates based on the

14  workload.

15       Q.    Let me ask you back in September of

16  2005, how many employees did Boan have.

17       A.    I don't recall exactly.  A rough

18  estimate would be between eighty and a

19  hundred.

20       Q.    Okay.  Do you know Roger Smith?

21       A.    I do.

22       Q.    Or did.

23       A.    I did.
```

8

1       Q.    And how did you know Roger?

2       A.    Roger was an employee of the

3  company.

4       Q.    Okay.  And what capacity was he in?

5       A.    He was a foreman.

6       Q.    And how long was Roger a foreman

7  for Boan?

8       A.    I don't recall exactly.  He was a

9  long time employee.  He did have a break in

10 service and had come back to Boan Contracting.

11 But I don't have the dates with me.

12      Q.    Does eighteen years sound about

13 right give or take that little break?

14      A.    Give or take the break, I think

15 that's in the neighborhood.

16      Q.    Do you know how long he was a

17 foreman?

18      A.    No, I do not.

19      Q.    Where did he work out of?

20      A.    What do you mean?

21      Q.    Well, is there a Fairhope office

22 and a Greenville office?

23      A.    There is a Fairhope office and a

9

```
1    Greenville office.  However, the Greenville

2    office would be his hub.  I mean, all of our

3    main operations are based out of Greenville.

4    Our equipment yard, our shop, everything is in

5    Greenville.  Fairhope is more of an

6    administrative office.

7         Q.   Okay.  What would be his duties as

8    a foreman?

9         A.   Leading a crew and performing the

10   actual project.  He would -- Pipeline

11   installation.

12        Q.   How many crew members would he have

13   under him?

14        A.   It depended on the job.  It could

15   be three to ten.

16        Q.   Okay.

17        A.   And he may work in conjunction with

18   other foremen on larger projects.

19        Q.   Okay.  Was he a salary employee?

20        A.   He was.

21        Q.   What was his -- You may not know,

22   but what was his salary in 2005?

23        A.   I believe it was a thousand a week.
```

10

```
1          Q.    Did he have any fringe benefits,

2     per diem, anything along those lines?

3          A.    Yes.

4          Q.    What kind?

5          A.    He made a per diem -- daily per

6     diem.

7          Q.    And what did that consist of?

8          A.    I would have to look.

9          Q.    Okay.  Did that consist of travel

10    pay?

11         A.    Mainly meals.

12         Q.    Meals?

13         A.    And then the company covered hotel

14    and lodging while they were on site at the

15    jobs.

16         Q.    What about transportation?

17         A.    He was assigned a company vehicle.

18         Q.    Okay.  In 2005, what kind of

19    vehicle did he have -- company vehicle?

20         A.    He had a pickup truck.

21         Q.    And how long was he assigned a

22    company vehicle?

23         A.    I believe he had one for the
```

11

1    duration of his employment.

2         Q.   Did all foremans have a company

3    vehicle?

4         A.   They do.

5         Q.   Are the foremans' vehicles

6    specialized or be any different from another

7    employee's vehicles like if a crew member had

8    a company vehicle?

9         A.   There may or may not be specific

10   equipment or a specific body type; bed, tool

11   box on his particular truck.

12        Q.   Do the foremans' company truck, do

13   they have particular tools that other company

14   trucks don't have?

15        A.   That would be on a case-by-case

16   basis.  It could, but I'm not aware of the

17   specifics that would be on any one truck.  And

18   there may be specific tools that are used on

19   one job but not used on another job.  So he

20   may have a tool with him at one time that he

21   wouldn't have three months later or two months

22   later.

23        Q.   What is Boan's policy concerning

12

1   the use of company vehicles?

2       A.   They're to be used for company

3   business.

4       Q.   Are they allowed to be used for

5   transportation to and from work?

6       A.   Yes.

7       Q.   So anyone who was issued a company

8   vehicle could use it to drive home or drive to

9   a job site?

10      A.   That's correct.

11

12      (Whereupon, a break was taken.)

13

14      Q.   I think I was asking you about the

15  policy Boan had concerning the use of company

16  trucks.  What is Boan's policy in regards to

17  company trucks in relation to vacation time?

18  Are the employees allowed to take the company

19  truck home with them when they go on vacation?

20  What's Boan's policy or does Boan have a

21  policy?

22      A.   The trucks are to be used for

23  business purposes.  So as far as -- An

13

1    employee shouldn't take a company truck on a

2    vacation.  But if it -- If it stays at his

3    house and then he goes on a vacation

4    somewhere, there's nothing prohibited against

5    that as long as he's not taking his truck on

6    his vacation.

7        Q.   So Boan doesn't have a particular

8    policy saying that basically because there may

9    be tools needed on one particular truck if

10   you're going on vacation, you need to leave

11   the truck at the job site?

12       A.    It would be the employee's

13   responsibility not to take something that was

14   needed on a job site away from that job site

15   for an extended period of time.  But there's

16   no set policy.  That's a common sense

17   objective.

18       Q.   Okay.  What is Boan's policy

19   concerning, say, you're at a job site with a

20   company truck out of town away from your home

21   and an emergency arises with your home?  Are

22   you allowed to use your company truck to

23   travel home if you had to leave from work?

14

1        A.    In an emergency situation, the

2    individual assigned the truck should obtain or

3    basically get authorization from his superior

4    with regard -- in an emergency situation.  I'm

5    sure if there was an emergency, an employee

6    who had a truck could contact Barry Boan and

7    ask permission to use his company truck to do

8    something of a personal nature in an emergency

9    situation.  And then Mr. Boan would make that

10   decision whether or not it was allowable.

11       Q.    Back in 2005, how many company

12   trucks did Boan have?

13       A.    I don't recall exactly.

14       Q.    Okay.  Who did you have your

15   insurance with?

16       A.    The agent was Turner Insurance and

17   Bonding.  The company was Zurich.

18       Q.    Did you have any dealings with the

19   insurance on automobiles?

20       A.    I did.

21       Q.    You personally.  Okay.

22       Did you have any dealings with naming

23   the insured on that policy --

15

1        A.   I did.

2        Q.   -- deciding who was the named

3   insured?

4        A.   I did.

5        Q.   Was Roger Smith a named insured on

6   the policy?

7        A.   He was listed as a driver on the

8   policy.

9        Q.   Was he listed as a driver matching

10  up to a particular company truck or just in

11  general for all company trucks?

12       A.   It's fleetwide is my understanding.

13       Q.   Okay.  Did you personally list him

14  as a driver?

15       A.   I don't understand what you're

16  asking.

17       Q.   I assume you had to fill out forms

18  with Zurich when you were getting your

19  insurance with them.

20       A.   Um-hum (yes).

21       Q.   Did you have to provide them with a

22  list of all drivers?

23       A.   They had a running list.  Turner

16

1    had been our agent since 2003, I think we

2    started back with them.  And they had a

3    running list of Boan Contracting drivers,

4    which, yes, I would be in charge of editing or

5    dropping and adding.

6          Q.   So if you got a new employee, you

7    would send over to Turner and say, hey, we've

8    got this new employee that's gonna be using

9    one of our company trucks?

10         A.   Exactly.  Well, we would basically

11   ask -- have Turner, who would submit a new

12   employee's information.  Turner would let us

13   know whether that person would be allowed or

14   would not be allowed to be added to our

15   driver's list.

16         Q.   What kind of qualifications would

17   that driver have to have?

18         A.   It depends on the truck obviously

19   whether you would have to have a regular

20   driver's license or a CDL.  And then outside

21   of that, we let the insurance company notify

22   us if there was a problem with the driver.

23   And our policy was if you were uninsurable,

17

1   then that was gonna be a problem from the

2   company's aspect.  But if the insurance

3   company had no problem insuring you as a

4   driver for us, then we didn't have a problem.

5       Q.   Okay.  How long was Roger Smith a

6   listed driver under your insurance policy --

7   automobile insurance policy?

8       A.   As far as I know, he was a listed

9   driver each year that he was with the company.

10      Q.   The entire time he was employed

11  whether it be eighteen or --

12      A.   To the best of my knowledge.

13      Q.   Okay.  Did you have to submit any

14  kind of qualifications for him like his

15  driving history to the insurance company or

16  things along those lines or did you just

17  provide the names to the insurance company?

18      A.   We provided the names.  I mean,

19  there could have been a MVR run on Roger or on

20  our drivers, but I don't believe that I

21  personally submitted that request.

22      Q.   But you know for certain personally

23  that Roger was a listed driver under the

18

```
 1    insurance.

 2         A.   To the best of my knowledge, he

 3    was.

 4         Q.   And you provided that list to

 5    Turner and Associates?

 6         A.   It would have been -- That's

 7    correct.

 8         Q.   Who is an agent of Zurich.

 9         A.   That's correct.

10              MR. MOORE:  Object to the form of

11    that last question.  Can you answer it again?

12         A.   Please restate it.

13         Q.   Okay.  You submitted that list of

14    drivers to Turner and Associates.

15         A.   Or they would have had a list from

16    the prior year that there would have been a

17    drop or an add to it.

18         Q.   Okay.  And that list contained

19    Roger Smith's name as a driver -- as a listed

20    driver.

21         A.   To the best of my knowledge.

22         Q.   All right.  And Turner and

23    Associates is an agent of Zurich Insurance.
```

19

1           MR. MOORE:  Object to the form.  Go

2    ahead if you know the answer.

3           A.   Turner was our agent.   Zurich was

4    the insurance company.

5           Q.   Let me take you back to September

6    8, 2005.  Do you recall that day?

7           A.   Yes.

8           Q.   That's the day Roger was killed in

9    the automobile accident.

10          A.   Yes.

11          Q.   Where was Roger working the week

12   prior to that?

13          A.   Jacksonville, Florida.

14          Q.   Okay.  And how long had he been

15   working in Jacksonville prior to that?

16          A.   I don't recall exactly, but some

17   period of months, I would think.

18          Q.   What were they doing down in

19   Jacksonville?

20          A.   Installing a water main.

21          Q.   Do you recall if Roger was taking

22   any vacation time prior to September 8, 2005?

23          A.   Prior being --

20

1     Q.   The week before or two weeks

2  before.

3     A.   I don't have direct knowledge of

4  him being on vacation.  It's my understanding

5  that he had taken some personal time prior to

6  that though.

7     Q.   Okay.  When?  Do you recall when

8  that was that he took some personal time?

9     A.   It's my understanding that he had

10  taken some personal time the prior week --

11     Q.   Right.

12     A.   -- or weekend.  But I don't know

13  the specifics.

14     Q.   Now, he was involved in this

15  accident on Thursday.  In relation to the

16  automobile accident, when do you think he was

17  taking the personal time?

18     A.   Either the end of the prior week or

19  over the prior weekend.

20     Q.   Okay.

21     A.   But that's -- I don't know that for

22  a fact.  That's just my understanding.

23     Q.   Yes, sir.  Did you deal with any of

21

1    the personal time?  When an employee wanted to

2    take personal time, did you --

3         A.    No.

4         Q.    -- have any dealings with it?

5         A.    No.

6         Q.    What about vacation time?

7         A.    No.  We don't have any set vacation

8    policies that are written.

9         Q.    What about personal time policies?

10        A.    We don't have any set personal time

11   policies that are written.

12        Q.    So how does that work if you need a

13   day off?

14        A.    If Roger -- If you need a day off,

15   you ask your superior for the day off.

16        Q.    Okay.  Do you recall anything

17   happening at the Jacksonville work site the

18   weekend prior to September 8th; any kind of

19   emergency, any kind of back log or anything

20   along those lines?

21        A.    I do not.

22        Q.    Okay.  Do you recall anybody

23   calling Roger while he was taking his personal

22

1    time and say, hey, Roger, we need you to come

2    back to the work site in Jacksonville?

3        A.   I'm not aware of any conversation

4    like that.

5        Q.   Who would make a call like that if

6    one was made?  Was it any particular person in

7    the company that would be responsible for that

8    particular work site in Jacksonville?

9        A.   I believe Barry Boan was at that

10   job site some or -- I don't know if he was at

11   that job site that particular time or not.

12   But Barry Boan was overall in charge of that

13   job.

14       Q.   So he would be Roger's direct

15   supervisor on that particular job site.

16       A.   That's correct.

17       Q.   Anybody else above Roger at that

18   particular job site?

19       A.   Barry Boan would be the top.

20       Q.   Okay.  So if a call was placed to

21   Roger telling Roger he needed to come to the

22   Jacksonville work site the weekend before his

23   death, it is very likely that Barry Boan would

23

1    have been the one either calling --

2        A.    Could have been.    Allen Boan also

3    could have called Roger if -- and asked him to

4    do that.    I would think one of those two.

5        Q.    Okay.    Do you recall when Hurricane

6    Katrina came through?

7        A.    I do.

8        Q.    Do you know if it had any affect on

9    the Jacksonville work site?

10       A.    I don't believe that it did.    I

11   think it was far enough west of Jacksonville

12   not to have any affect there.

13       Q.    Whether it be a lot of rain that

14   would require y'all to take days --

15       A.    It's possible.

16       Q.    Do you know if y'all were behind at

17   Jacksonville during this period of time during

18   September of 2005?

19       A.    I don't remember specifically.    I

20   believe there were some weather related issues

21   with that job.    I don't know if it's

22   necessarily Katrina related.

23       Q.    Okay.    What is Boan's policy

24

```
1    concerning traveling to and from work?  Do

2    y'all consider that to be part of your work?

3    I know sometimes like in this particular case

4    Roger had to travel to and from Jacksonville.

5         A.   Um-hum (yes).

6         Q.   Was that his scope of employment

7    when he was traveling to and from

8    Jacksonville, Florida?

9              MR. MOORE:  Object to the form.  Go

10   ahead.

11        A.   He had to get to and from the job

12   site to perform his work.

13        Q.   Did y'all consider him actually

14   working?  If he was driving to the work site,

15   did y'all consider that to be working?

16        A.   It was part of his work getting to

17   and from the job site.

18        Q.   Okay.  I understand Roger's estate

19   has made a workmans comp claim for his death.

20        A.   Yeah.

21        Q.   And y'all -- Boan didn't dispute

22   that he was in the line or scope of his

23   employment as that workmans comp claim was
```

25

1    concerned.

2         A.    Boan Contracting did not dispute

3    that.

4         Q.    Even though he was on his personal

5    vehicle.

6         A.    That's correct.

7         Q.    Okay.  What do you understand --

8    What is your understanding of the reasons why

9    he was on his personal vehicle?

10        A.    It's my understanding Roger had

11   taken care of some personal business out of

12   state and then drove directly to the job site

13   because he was -- He was in his personal

14   vehicle because he was handling a personal

15   matter and went ahead and drove to the job

16   site in his personal vehicle and upon leaving

17   the job site, was still in his personal

18   vehicle and drove home.

19        Q.    Okay.  Does Boan keep up with the

20   work period -- Let me ask it this way.

21        If a crew was working in Jacksonville,

22   Florida and they had worked for a two-week

23   span without coming home, does Boan keep up

26

1    with that in some form or fashion to tell you

2    exactly what crew was down in Jacksonville and

3    for what period of time?

4         A.   Yes.

5         Q.   Are you responsible for those

6    records?

7         A.   I have a payroll clerk who is

8    responsible directly for those records, but

9    I'm her supervisor, so yes.

10        Q.   Okay.  Would it matter whether an

11   employee was a salary employee or not?  Would

12   you still --

13        A.   No.  There would be a time sheet

14   for salary and/or hourly laborer.

15        Q.   So there's a way to find out

16   exactly when Roger reported to the job site in

17   Jacksonville prior to September 8th?

18        A.   Yes.

19        Q.   And that's a payroll report or

20   something?

21        A.   Should be.

22        Q.   Okay.  Would you still have those

23   records even though it may be back in 2005?

27

```
 1        A.    It's possible.

 2        Q.    So those records would give us a

 3   clear indication of when he reported to that

 4   job site a week before his --

 5        A.    It's possible.  Roger was salaried,

 6   so he may not -- His records may not be as

 7   detailed.  But the crew in Jacksonville for

 8   those times period involved would be set out.

 9        Q.    Okay.  And a member of his crew was

10   Doug Boutwell; is that right?

11        A.    I believe so, but I'm not sure.

12        Q.    I think he testified that he was a

13   member of his crew.

14        A.    Um-hum (yes).

15        Q.    Would Doug's records, him not being

16   a foreman, would those reflect when Doug went

17   down to the job site also?

18        A.    Yes.

19        Q.    Okay.  And when he left the job

20   site?

21        A.    Yes.

22        Q.    Do you know if Roger's company

23   truck -- In September of 2005, do you know if
```

28

```
1    it was ever in the shop being repaired or

2    having modifications done to it?

3         A.   I don't have any direct knowledge

4    of that.

5         Q.   Who would have direct knowledge of

6    that?

7         A.   Our shop foreman.

8         Q.   The shop foreman in Greenville?

9         A.   In Greenville, yes.

10        Q.   And who is the shop foreman?

11        A.   Ernie Floyd.

12        Q.   That's it.

13

14   EXAMINATION BY MR. MOORE:

15        Q.   Mr. Scott, I'm gonna have a few

16   questions for you.  I'll try to keep it brief

17   and try not to repeat things you've already

18   been asked.

19        A.   Okay.

20        Q.   But I probably will anyway.  And I

21   apologize for that.

22        You were asked some questions about Mr.

23   Smith's being a listed driver under the auto
```

29

1    policy Boan had through Zurich.  Do you recall

2    that?

3        A.    I do.

4        Q.    It's my understanding that the

5    policy also -- about how many -- Let's just go

6    back.  Do you know about how many listed

7    drivers there are under that policy just

8    roughly?

9        A.    I do not specifically.  I would

10   direct you to the policy.

11       Q.    That's fine.  Thank you.  There

12   are, are there not, under that policy a number

13   of Boan employees who are insured while

14   they're driving any vehicle, not just a

15   company vehicle; is that right?

16       A.    There are.

17       Q.    Are you one of those employees?

18       A.    I am.

19       Q.    Was Mr. Smith ever one of those

20   employees?

21       A.    Not to my knowledge.

22       Q.    The policy would indicate --

23       A.    The policy would indicate it.

30

```
 1        Q.   -- ultimately whether he was or

 2   wasn't; correct?

 3        A.   That's correct.

 4        Q.   Did you have any role in obtaining

 5   for Boan that additional coverage for certain

 6   employees while they were driving their own

 7   personal vehicles?

 8        A.   I did.

 9        Q.   And was that coverage provided to

10   your recollection through means of the

11   endorsement to the policy?

12        A.   Yes.  It was provided through, I

13   believe, driver other car, an endorsement or

14   additional coverage.

15        Q.   And that was something -- I'm

16   sorry.  Go ahead.

17        A.   It was listed in the policy.

18        Q.   And so am I correct to say that

19   Boan chose to add that additional coverage for

20   those certain employees and therefore obtained

21   that endorsement that you just described?

22        A.   That's correct.

23        Q.   Are you the individual who dealt
```

31

```
 1    directly with Turner with respect to renewing

 2    the -- or to obtaining the Zurich auto policy

 3    for Boan?

 4         A.   I did.

 5         Q.   And do you recall when Boan first

 6    got its auto insurance through Zurich?

 7         A.   I believe it was 2003.

 8         Q.   Okay.

 9         A.   June 2003.

10         Q.   And then that policy was renewed in

11    '04 and then in '05?

12         A.   I believe that's correct.

13         Q.   Do you recall anything -- Who was

14    the agent -- the Turner agent?

15         A.   Frank Dean.

16         Q.   Frank Dean.  Do you remember any

17    conversations with Mr. Dean in connection with

18    this Zurich policy about uninsured motorist

19    coverage in particular?

20         A.   I don't remember any direct

21    conversations, but that -- any policy

22    questions, I would direct to the policy

23    itself.
```

32

1        Q.    Sure.  And I'm just trying to ask

2    if you remember anything Mr. Dean said to you

3    while you were discussing the policy with him

4    about uninsured motorists.

5        A.    Not specifically, no.

6        Q.    Again, that's a long time ago.  I

7    wouldn't expect you to remember that.  But if

8    you do, I just wanted to know what it was.

9        A.    Okay.

10        Q.    You were asked about your

11    understanding with regard to Mr. Smith and his

12    being off work or on vacation prior to his

13    accident --

14        A.    Um-hum (yes).

15        Q.    -- in September of 2005.  And I

16    believe you said it was your understanding

17    that he took some time off approximately the

18    week before that accident; is that right?

19        A.    Roughly.  I don't know the exact

20    dates, but sometime before the accident.

21        Q.    And what is the source of your

22    information about that?

23        A.    Other company employees.  I have no

33

```
1    direct knowledge of that whatsoever.  Roger

2    didn't tell me he was going anywhere.  He

3    didn't call and inform me of anything.  But

4    through conversation with other company

5    employees, that's how I acquired that

6    information.

7         Q.   Were those conversations -- Did

8    those conversations you're referring to take

9    place after his accident or before his

10   accident?

11        A.   After.

12        Q.   You were also asked several

13   questions about who would have been the person

14   who could have called Mr. Smith if there had

15   been an emergency.  But you're not aware of

16   any actual emergency in connection with the

17   Jacksonville, Florida job in the week prior to

18   Mr. Smith's accident; right?

19        A.   I'm not aware of any such instance.

20        Q.   So you're not -- You haven't told

21   us here today that any of those folks; Barry

22   Boan or anybody else did call Mr. Smith.

23        A.   No.
```

34

1          Q.   You were asked about whether Boan

2    -- what Boan considers in connection with the

3    employees -- its employees driving to and from

4    job sites.  Does Boan pay its employees for

5    the time they spend driving to and from job

6    sites?

7          A.   I'm not sure what you're asking.

8    Is there a difference in salaried employee

9    versus an hourly employer?

10         Q.   Right.  A salaried employee is paid

11   a salary.  So --

12         A.   Right.

13         Q.   With respect to an hourly employee,

14   do they clock in at the job site or do they

15   clock in when they leave home to drive to the

16   job site?

17         A.   I believe it differs.  If it starts

18   or if -- Jobs work differently since our

19   locations are in various areas.  Certain

20   employees -- All of our employees don't all

21   live in Greenville, Alabama.  They live in

22   various spots.  So some of them get to our job

23   sites on their own.  Some get to out job sites

35

```
 1    by coming to Greenville and then going to the
 2    job site with a crew.  So it all differs.
 3         Q.   Okay.  But with respect to Mr.
 4    Smith, he was an hourly employee at the time
 5    of his accident; right?
 6         A.   He was salary.
 7         Q.   I'm sorry.  I misstated that.  He
 8    was a salary employee at the time of his
 9    accident.
10         A.   That's correct.
11         Q.   So he wasn't clocking in at the job
12    site anyway.
13         A.   No.
14         Q.   You testified about your
15    understanding that Mr. Smith had been
16    somewhere on a personal errand or personal
17    reasons prior to his accident and that he
18    drove in his own personal truck to the job
19    site from that location, whether he had been.
20         A.   Yes.
21         Q.   Again, what is the source of your
22    information about that?
23         A.   Various conversations with various
```

36

1    other Boan Contracting employees.

2        Q.   Again, after his accident?

3        A.   After his accident.

4        Q.   Did you ever speak with Mr. Smith

5    himself about --

6        A.   No, I did not.

7        Q.   Have you ever spoken with his wife

8    since -- about any of these facts concerning

9    where he had been prior to his accident?

10       A.   No, I have not.

11       Q.   Have you ever spoken with Ms. Smith

12    since the accident?

13       A.   I may have spoken with her shortly

14    after the accident.

15       Q.   Do you recall any discussions with

16    her about the facts of his accident or his

17    work down in Jacksonville?

18       A.   No.

19       Q.   Is it your understanding that the

20    workers compensation claim filed by Mr.

21    Smith's estate has been paid?

22       A.   It's in the process -- Yes.  But

23    it's a annuatized settlement, so it's in the

37

```
 1    process of being paid.

 2         Q.   Okay.  And you were asked if Boan

 3    disputed the claim at all, and the answer was

 4    no.

 5         A.   We did not.

 6         Q.   Do you know -- Who is Boan's

 7    workers compensation carrier?

 8         A.   The insurance is Alabama

 9    Self-Insured Workmans Comp Fund.

10         Q.   Do you know if that entity disputed

11    the claim in any way?

12         A.   I'm not aware of any such dispute.

13         Q.   How much is the -- How much

14    benefits are being paid to Mr. Smith's estate?

15         A.   It's my understanding that she's

16    receiving five hundred dollars a week.

17         Q.   And how long does that payment

18    stream last?

19         A.   My understanding is ten years, but

20    I don't know that to be a fact.

21         Q.   Did Boan have any policy of life

22    insurance in place on Mr. Smith at the time of

23    his death?
```

38

1       A.    Boan Contacting did not.

2       Q.    Did Boan Contracting reimburse Mr.

3   Smith or his family for his use of his own

4   personal car the week that he was going back

5   and forth to Jacksonville in it?

6       A.    Not to my knowledge.

7       Q.    Does Boan have any policy regarding

8   the reimbursement of employees for the use of

9   their own personal vehicles?

10      A.    There's no written policy.

11      Q.    Okay.  Do you have any knowledge

12  with respect to where Mr. Smith was going at

13  the time of his accident?

14      A.    I don't have any direct knowledge.

15      Q.    What's your understanding?

16      A.    My understanding is he was going to

17  his residence.

18      Q.    As far as you know, he wasn't

19  returning to the Greenville office or going

20  anywhere on Boan's instructions?

21      A.    Not as far as I know.

22      Q.    And I understand you don't have

23  direct knowledge.

39

```
 1        A.    Right.  I don't.

 2        Q.    That's it, Mr. Scott.

 3

 4   EXAMINATION BY MR. SLEDGE:

 5        Q.    Just a couple of follow-up

 6   questions.

 7        Does Boan dispute that Roger Smith was

 8   acting in the line and scope of his employment

 9   with Boan Contracting when he was killed in

10   this automobile accident?

11             MR. MOORE:  Object to the form

12   particularly because I don't know that Mr.

13   Scott is a person to make that statement on

14   behalf of Boan.

15        Q.    Do you have any knowledge that Boan

16   is disputing that Roger Smith was acting

17   within his line and scope of his employment

18   with Boan Contracting when he was killed in

19   the automobile accident back on September 8,

20   2005?

21        A.    I do not have any knowledge.

22        Q.    Now, I asked you some questions

23   about as far as the workmans comp claim was
```

40

1    concerned.  There was no dispute over whether

2    he was in the line and scope of his

3    employment.

4         A.   Not that I'm aware of.

5         Q.   All right.  You spoke earlier about

6    driver -- drive other coverage under the

7    insurance policy with Zurich.

8         A.   Um-hum (yes).

9         Q.   And you said you were listed as one

10   of the other drivers that had additional

11   coverage.

12        A.   That's correct.

13        Q.   I'm gonna show you a page from the

14   actual policy that I received from Zurich

15   Insurance Company and ask you to look at that.

16   I'm referring to the policy coverage.

17        Do you recognize this page?

18        A.   Not specifically, no.

19        Q.   Okay.  Have you ever seen this?

20   Have you ever actually seen the Zurich policy?

21        A.   I have seen the policy.

22        Q.   Okay.  Now, the title of this page

23   is Drive Other Car Coverage Broaden; is that

41

```
 1   correct?

 2        A.   That is correct.

 3        Q.   Okay.  And it contains your name on

 4   down the page.

 5        A.   It does.

 6        Q.   All right.  Now, you testified

 7   earlier that you were one of the employees

 8   that had additional coverage --

 9        A.   That's correct.

10        Q.   -- under the Zurich policy.  What

11   is your understanding about that additional

12   coverage?

13        A.   What do you mean?

14        Q.   Well, you said you had additional

15   coverage.

16        A.   Right.

17        Q.   What makes your coverage different

18   from another employee's?

19        A.   My coverage is to drive any other

20   vehicle that's not listed on Boan

21   Contracting's auto schedule.

22        Q.   So correct me if I'm right or tell

23   me if I'm right.  My understanding is that if
```

42

1    you're driving your own personal vehicle, your

2    personal vehicle is covered under Zurich --

3    Boan's policy with Zurich.

4        A.    That's correct.  Even though my

5    personal vehicle was not listed on Boan's

6    automobile policy.

7        Q.    Okay.  Now, look at this form for

8    me and tell me what additional premium was

9    paid for that additional coverage.

10       A.    I believe it's included.

11       Q.    It was included.  So that

12   additional coverage for yourself was included

13   in the policy with Zurich that Boan had.

14       Let me rephrase that a little better.

15   It was included in the policy of automobile

16   insurance that Boan had with Zurich.  It was

17   included in the premium.

18       A.    This is a part of the policy, yes,

19   or an endorsement or attachment too.

20       Q.    So there was no additional cost for

21   you to receive this additional insurance.

22       A.    I'm not aware of that.  I don't

23   know how Zurich came up with the premium.

43

1     Q.  Okay.  But it says premium down

2  here, and it says right beside your name, it

3  says "included".

4     A.  Okay.

5     Q.  Is that correct?

6     A.  I agree.

7     Q.  Do you know if that cost Boan any

8  more money to insure you in that form?

9     A.  I do not know.

10     Q.  Okay.  And this particular form

11  says it's included; is that right?

12     A.  It does.

13     Q.  Okay.  And your understanding of

14  that coverage is basically you could drive

15  your personal vehicle and if you were killed

16  in a car accident driving your personal

17  vehicle, you would be covered under Boan's

18  policy with Zurich.

19     A.  In the line of -- If it's

20  performing business for Boan Contracting, yes.

21     Q.  And looking at this form, Boan

22  didn't have to pay a dollar more to Zurich for

23  that coverage for you.

44

1        A.    If that's how you read the form.

2        Q.    And again, it says right here plain

3   and simple David Scott, see limits.  And we're

4   talking about uninsured motorist.

5        A.    Um-hum (yes).

6        Q.    And it says premium included.

7        A.    Right.  But --

8        Q.    And up here with the actual

9   liability, the limits of liability are one

10  million dollars.  And it says premium

11  included.

12       A.    It does.

13       Q.    Okay.  And again, like I said,

14  uninsured motorist limits, see schedule.  So

15  it's referring you back to the schedule,

16  whatever the schedule is for the UM limits.

17  And it says premium, and under that, it says

18  included.

19       A.    Included.

20       Q.    Okay.  So basically all this is

21  adding is the personal vehicle clause.  Your

22  personal vehicle is insured under this.

23  That's all that's really adding.  No

45

```
1    additional coverage.

2         A.    And the other drivers who are on

3    that.

4         Q.    Okay.  Did Turner and Associates or

5    Zurich ever notify Boan to your knowledge that

6    they could extend this same coverage to every

7    employee and it wouldn't cost them an

8    additional premium?

9         A.    No.

10        Q.    Okay.  Thank you, sir.

11

12   EXAMINATION BY MR. MOORE:

13        Q.    Just one or two, Mr. Scott.

14        Would you agree with me with respect to

15   the coverage provided by the endorsement Mr.

16   Sledge was just asking you about that it's the

17   policy as it's written that dictates what the

18   coverage actually is?

19        A.    I would agree with that.

20        Q.    And you were being asked -- You

21   were testifying, were you not, as to what your

22   understanding of the coverage is.

23        A.    That's correct.
```

46

1      Q.    But the real coverage is determined

2    by what's written in the policy.

3      A.    That's correct.  The coverage is

4    determined by the policy.

5      Q.    Okay.  Have you ever spoken with

6    anybody with Zurich about the claim for

7    uninsured motorist benefits that's been made

8    by Mr. Smith's estate?  And I'm talking to you

9    here today.  I don't mean the lawyers.  Any

10   employee of Zurich about the claim that's

11   being made on behalf of Mr. Smith's estate.

12     A.    I think a claims adjustor did make

13   contact with me.  I don't recall the specifics

14   other than just discussing the generalities

15   that's involved in making sure Mr. Smith was

16   an employee.  But I don't recall any specific

17   conversation.

18     Q.    Is that the only contact you can

19   recall?

20     A.    The contact was very general.

21     Q.    That's it, Mr. Scott.

22           MR. SLEDGE:  That's it.

23           FURTHER DEPONENT SAITH NOT

47

```
 1                C E R T I F I C A T E

 2

 3    STATE OF ALABAMA)

 4    COUNTY OF BUTLER)

 5

 6         I do hereby certify that the above and

 7    foregoing transcript of proceedings in the

 8    matter aforementioned was taken down by me in

 9    machine shorthand, and the questions and

10    answers thereto reduced to writing under my

11    personal supervision, and that the foregoing

12    represents a true and correct transcript of

13    the proceedings given by said witness upon

14    said hearing.

15

16         I further certify that I am neither of

17    counsel nor related to the parties to the

18    action, nor am I in any wise interested in the

19    result of said cause.

20

21                    --------------------

22                    Sue Anne Casey

23                    Court Reporter
```